*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 12a0136p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

―――――――――――



LEWIS RODNEY GAGNE,

　　　　　*Petitioner-Appellee,*

　　*v.*

No. 07-1970

RAYMOND BOOKER, Warden,

　　　　　*Respondent-Appellant.*

―――――――――――

Appeal from the United States District Court
for the Eastern District of Michigan at Ann Arbor.
No. 04-60283—Marianne O. Battani, District Judge.

Argued: March 2, 2011

Decided and Filed: May 16, 2012

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, NORRIS, MOORE,
COLE, CLAY, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE, GRIFFIN,
KETHLEDGE, WHITE, and STRANCH, Circuit Judges.

―――――――――――

## COUNSEL

**ARGUED:** Laura Moody, MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing,
Michigan, for Appellant. Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE,
Grand Rapids, Michigan, for Appellee. **ON BRIEF:** Laura Moody, B. Eric Restuccia,
MICHIGAN ATTORNEY GENERAL'S OFFICE, Lansing, Michigan, for Appellant.
Paul L. Nelson, FEDERAL PUBLIC DEFENDER'S OFFICE, Grand Rapids, Michigan,
for Appellee. Benjamin C. Mizer, OFFICE OF THE OHIO ATTORNEY GENERAL,
Columbus, Ohio, Margaret Garvin, NATIONAL CRIME VICTIM LAW INSTITUTE
AT LEWIS & CLARK LAW SCHOOL, Portland, Oregon, Mellissa Fuhrmann,
JUSTICE LEAGUE OF OHIO, Powell, Ohio, for Amici Curiae.

　　　　BATCHELDER, C. J., announced the judgment of the court and delivered an
opinion, in which BOGGS, GIBBONS, SUTTON, COOK, McKEAGUE, and GRIFFIN,
JJ., joined. SUTTON (p. 34), and GRIFFIN (pp. 35–38), JJ., delivered separate
concurring opinions. MOORE, J. (pp. 39–44), in which COLE, J., joined, CLAY, J. (pp.
45–49), and WHITE, J. (p. 50), delivered separate opinions concurring in the judgment
only. MARTIN, J. (p. 51), delivered a separate dissenting opinion. KETHLEDGE, J.

1

(pp. 52–70), also delivered a separate dissenting opinion, in which MARTIN, NORRIS, ROGERS, and STRANCH, JJ., joined.

————————————

**OPINION**

————————————

ALICE M. BATCHELDER, Chief Judge.  The respondent, Warden Raymond Booker, represented by the State of Michigan's Attorney General and Solicitor General (hereinafter "the State"), appealed the district court's grant of *habeas corpus* to petitioner-appellee Lewis Gagne.  *See Gagne v. Booker*, No. 04-60283, 2007 WL 1975035, 2007 U.S. Dist. LEXIS 47616 (E.D. Mich. July 2, 2007).  A three-judge panel affirmed.  *Gagne v. Booker*, 596 F.3d 335 (6th Cir. Feb. 23, 2010), *opinion amended and superseded by* 606 F.3d 278 (6th Cir. May 25, 2010).  The State sought *en banc* rehearing, which we granted; we correspondingly vacated the panel opinion.  *Gagne v. Booker*, No. 07-1970, 2010 U.S. App. LEXIS 15052 (6th Cir. July 20, 2010).  We now REVERSE.

**I.**

In July 2000, Lewis Gagne and his friend Donald Swathwood (also his co-defendant) had decided to move to California.  Gagne was unemployed and his turbulent six-month relationship with his former-girlfriend, P.C., had ended approximately three weeks earlier.  On the evening of July 3, 2000, Gagne, Swathwood, and another friend, David Stout, were out for a good time.

When their car ran out of gas, they walked to P.C.'s house and found her there.  P.C., who had been drinking for most of the day, agreed to get cash from the ATM to buy gas, beer, and crack cocaine.  Upon their return, and after smoking, drinking, and showering, P.C. began to have sex with Gagne, whereupon Swathwood joined in.  P.C. engaged in fellatio, vaginal intercourse, and anal intercourse with both men.  She also engaged in fellatio with Stout, albeit briefly, and during the course of this "escapade," had multiple vibrators and a wine bottle inserted into her vagina and rectum.  At

approximately 5:00 a.m. the next morning, the three men took P.C.'s ATM card, withdrew $300, bought crack cocaine, and smoked it all themselves.

Later that afternoon, P.C. called the police and accused Gagne and Swathwood of rape. She claimed that, while she had originally begun a consensual sexual encounter with Gagne, she had protested Swathwood's uninvited participation and, rather than relenting when she objected, Swathwood and Gagne had held her down, forcibly raped and sodomized her, mocked her and laughed at her, and tried to force her to perform fellatio on Stout, who was drunk, stoned, and virtually incoherent. Gagne and Swathwood replied that the whole episode was consensual; that P.C. had initiated and directed the "wild orgy" and had given them the ATM card with orders to return with more crack. They claimed that P.C. was the classic "woman scorned," frustrated that Gagne was leaving for California and angry that the men had smoked the crack without her.

The State charged Gagne and Swathwood with three counts each of first-degree criminal sexual misconduct in violation of Michigan law, M.C.L. § 750.520b(1)(f) (sexual penetration through use of force, causing injury to the victim). Both defendants entered not-guilty pleas, and the case was set for a jury trial in a Michigan state court. Stout was to be a witness, but not a defendant.

At the conclusion of a seven-day trial, the jury convicted Swathwood on all counts and Gagne on two (the jury acquitted Gagne of one count of forced fellatio). The court sentenced Swathwood to a prison term of 15 to 30 years, and Gagne to a term of 22½ to 45 years.

## II.

The present appeal stems from a pre-trial ruling by a Michigan trial court on the admissibility of two particular pieces of evidence proffered by the two criminal defendants: an allegation that the alleged victim, P.C., and defendant Gagne had, on a certain prior occasion, engaged in group sex with another individual, one Ruben Bermudez; and a separate allegation that P.C. had, on a certain prior occasion, offered

to engage in group sex with Gagne and his father. The defendants moved to admit this evidence pursuant to the Michigan Rape Shield Law, M.C.L. § 750.520j, but the trial court denied the motion and excluded the evidence (and any argument regarding it).

After conviction, the defendants appealed this decision to the Michigan Court of Appeals, arguing that the trial court's exclusion of the evidence violated the Michigan Rape Shield Law in a manner that also violated their Sixth Amendment rights to a fair trial, to confront their accuser, and to present a complete defense. The Michigan Court of Appeals rejected this claim and affirmed the convictions. *See Michigan v. Swathwood*, Nos. 235540 & 235541, 2003 WL 1880143, 2003 Mich. App. LEXIS 922 (Mich. Ct. App. Apr. 15, 2003).[1] Gagne sought leave to appeal to the Michigan Supreme Court, but was denied. *Michigan v. Gagne*, 673 N.W.2d 755 (Mich. 2003).[2]

After exhausting his state-court appeals, Gagne petitioned for *habeas corpus* relief in federal district court, claiming — among other things[3] — that the Michigan state courts had violated his Sixth Amendment rights to a fair trial by excluding the testimonial evidence about the group sex with Bermudez and the offer of group sex with his father. The district court granted the petition, *see Gagne*, 2007 WL 1975035, 2007 U.S. Dist. LEXIS 47616, and the State appealed.

Because Gagne's argument on this issue has "evolved" over the course of the proceedings, it is worthwhile to track this claim from the beginning and review the arguments, counter-arguments, and decisions at each of the three prior stages: trial, state appellate, and federal *habeas*.

---

[1]The appellate court also rejected claims of improper exclusion of other evidence, prosecutorial misconduct, ineffective assistance of counsel, insufficiency and weight of the evidence, cumulative error, and error in sentencing.

[2]Three Justices of the Michigan Supreme Court dissented from the denial. Justices Cavanagh and Kelly would have reversed and remanded for a new trial, while Justice Markman would have granted leave to appeal. None of the three wrote separately to explain the basis for his or her dissent. *See Gagne*, 673 N.W.2d at 755.

[3]Gagne also claimed improper exclusion of evidence, prosecutorial misconduct, and ineffective assistance of counsel. The district court denied relief on those claims. *See Gagne*, 2007 WL 1975035, 2007 U.S. Dist. LEXIS 47616. Gagne did not file any cross-appeal in this court to challenge the district court's denial of those claims.

**A.**

Michigan's Rape Shield Law, which lies at the origin of Gagne's constitutional claim, is a rule of evidence particular to criminal sexual-misconduct cases and provides that:

> (1) Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted under sections 520b to 520g [FN1] unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:
>
> > (a) Evidence of the victim's past sexual conduct with the actor.
> >
> > (b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.
>
> (2) If the defendant proposes to offer evidence described in subsection (1)(a) or (b), the defendant within 10 days after the arraignment on the information shall file a written motion and offer of proof. The court may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1). If new information is discovered during the course of the trial that may make the evidence described in subsection (1)(a) or (b) admissible, the judge may order an in camera hearing to determine whether the proposed evidence is admissible under subsection (1).
>
> [FN1] M.C.L.A. §§ 750.520b to 750.520g.

M.C.L. § 750.520j.

Prior to trial, Gagne identified certain items or instances concerning P.C.'s sexual history that he deemed relevant to his defense and filed a "Motion and Offer of Proof," pursuant to § 750.520j(2), seeking to admit them as "proof of the victim [P.C.]'s past sexual conduct with him for the purpose of establishing consent." Five of those items[4] were argued together:

---

[4]Gagne actually listed six items together in the motion, but voluntarily withdrew this one almost immediately: "e. Defendant [Gagne] proposes to offer evidence that the alleged victim [P.C.] always gets 'horny' when she smokes crack cocaine as the evidence will reveal occurred on the date of the alleged offense."

1.  An allegation that P.C., Gagne, and Swathwood had, on a certain prior occasion in June 2000, engaged in group sex, which also included two other women they had met at a bar (i.e., "the Tony's Lounge Incident");

2.  An allegation that P.C. and Gagne had, on a certain prior occasion in June 2000, engaged in group sex with another individual, one Ruben Bermudez;

3.  An allegation that P.C. and Gagne, during their relationship, had commonly used "sex toys", including vibrators, a wine bottle, and others;

4.  An allegation that it was P.C. who had invited Stout (who was not charged as a defendant) to participate in the group sex on the night in question; and

5.  An allegation that P.C. had, on a certain prior occasion, offered to engage in group sex with Gagne and his father, Rodney Gagne.

Gagne asserted that these "factual scenarios[,] constituting [his] offer of proof[,] [we]re probative of the issue of the alleged victim [P.C.]'s consent to have sexual relations with multiple partners simultaneously[,] and that the use of objects in connection with sexual activities is not necessarily inconsistent with the existence of consent on the part of the alleged victim [P.C.]."[5]

The State opposed the motion and the trial court ordered a hearing pursuant to § 750.520j(2) — though not *in camera* — "to determine whether the proposed evidence [wa]s admissible under [§ 750.520j] subsection (1)." *See* § 750.520j(2). At the hearing, the State conceded that the first item (the Tony's Lounge Incident) fell within the subsection (1) exception because that past sexual conduct (i.e., that specific incident) involved the victim and these same two defendants, but argued for exclusion because its inflammatory or prejudicial nature outweighed its probative value. The State argued for exclusion of the third item (the sex toys) on the basis that the statute did not allow for such evidence, which the State characterized as "purely inflammatory."

---

[5]Gagne did not raise any constitutional argument in his "Motion and Offer of Proof," but that is hardly surprising inasmuch as that particular motion is a specific aspect of the Michigan Rape Shield Law, *see* § 750.520j(2).

The State addressed the second and fifth items (i.e., the group sex with Bermudez and the offer of group sex with Gagne's father) together, and argued against their admission:

> [T]his evidence, Judge, is I believe totally prohibited by the statute. It is irrelevant. It is inflammatory. And basically what [the defendants are] doing is . . . taking what is prohibited under many rules of evidence that we have, taking character evidence from which to infer conduct. In other words, [the defendants are] saying and alleging that these [two particular] prior invitations or activities . . . of the victim's willingness, if you will, to participate in sexual acts with multiple individuals therefore predisposes her to have consented [to] sexual activities with both of these defendants [Gagne and Swathwood]. That is prohibited by 404(A), the first sentence, 404(B), the first sentence, of the Michigan Rules of Evidence[6] as well as the rape shield statute. It has nothing to do with sexual activity with these two gentlemen.

In discussing these items, the trial court expressed its concern that, "I just don't have any case law on a situation where somebody other than the victim and the actor, being the defendant, participated in sexual activities," to which Gagne's counsel responded:

---

[6]The Rule cited here, Michigan Rule of Evidence 404: "Character Evidence Not Admissible to Prove Conduct; Exceptions; Other Crimes," states, in pertinent part:

> (a) Character evidence generally. Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion, except:
>
> . . .
>
> (3) Character of victim of sexual conduct crime. In a prosecution for criminal sexual conduct, evidence of the alleged victim's past sexual conduct with the defendant and evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease;
>
> . . .
>
> (b) Other crimes, wrongs, or acts.
>
> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, scheme, plan, or system in doing an act, knowledge, identity, or absence of mistake or accident when the same is material, whether such other crimes, wrongs, or acts are contemporaneous with, or prior or subsequent to the conduct at issue in the case.
>
> . . . .

Mich. R. Evid. 404 (effective June 1, 1995). This version was in effect at the time of Gagne's trial (circa February 2001). Rule 404 was amended on May 21, 2001 (effective September 1, 2001), but the only change to the above-quoted passage was the substitution of "alleged victim" for "victim" in subrule (a)(3). *See* Notes to the 2001 Amendment.

> And . . . maybe this will be the case. This is, to put it mildly, an unusual case, and I would only submit [that] to prohibit that evidence [of the group sex with Bermudez and the offer of group sex with Gagne's father] from coming in because there is a third party involved would serve no purpose either under the rape shield statute and it certainly would, I think, violate my client's [constitutional] right to confrontation[7] and right to establish evidence that goes toward the issue of consent.

At the trial court's invitation, the State offered this response:

> Yes, Judge. In relation to [the prior acts or offers of group sex], I would suggest, number one, that . . . this is pure, unabashed character evidence and trying to show character and action in conformity therewith, which is prohibited by the first sentence of 404(A) and 404(B) of the Michigan Rules of Evidence.
>
> Secondly, it is irrelevant to the question of whether the victim on the date in question consented to sexual activity with these two defendants together. And I agree with the [c]ourt, Judge, that, as I said, the presence of additional people other than the actors in this case shows that the evidence is not allowed under the [rape shield] statute, and again, Judge, it's highly inflammatory. And in relation to [the Tony's Lounge Incident], Judge, yes, the two actors are involved and if this [c]ourt finds that the balancing test weighs in favor of the admission for the defendants [then] in order for that balancing test really to work, I think this [c]ourt must preclude the information of the activities of other individuals because it takes it to inflammatory levels and it also has nothing to do with the victim's consent [to the sexual activities, as described,] with these two individuals. Nothing further.

The trial court analyzed the items' admissibility under the Rape Shield Law, M.C.L. § 750.520j, and did not address Gagne's constitutional claim (i.e., "right to confrontation") or the State's argument concerning Rule 404 of the Michigan Rules of Evidence.[8] The court explained:

---

[7]This was defense counsel's first assertion of a *constitutional* right to this evidence.

[8]It is perhaps noteworthy that the analysis contained herein would have been markedly different if the trial court had decided the issue based on the "standard" rules of evidence rather than the Rape Shield Law, inasmuch as it is the established law of this Circuit (and, therefore, presumptively reasonable) that "[t]he Sixth Amendment right to present a complete defense . . . does not imply a right to offer evidence that is otherwise inadmissible under the standard rules of evidence." *Wynne v. Renico*, 606 F.3d 867, 871 (6th Cir. 2010) (quoting *United States v. Lucas*, 357 F.3d 599, 606 (6th Cir. 2004)); *accord United States v. Armstrong*, 436 F. App'x 501, 505 (6th Cir. 2011).

As to 520j(a), evidence of a victim's past sexual conduct with the actor, the [c]ourt believes that as to [the Tony's Lounge Incident,] that that matter ought to be permitted to come to the jury's attention. I don't find that it is inflammatory or prejudicial in nature, and its probative value outweighs its possible prejudicial value.

As to [the sex toys], the [c]ourt will permit discussions with the victim, I take it on cross-examination of the victim by [Gagne's counsel] and perhaps [Swathwood's counsel]. [The use of sex toys], it would appear to the [c]ourt, if true, it is not inflammatory or prejudicial to the extent that it outweighs its probative value.

As to the remainder of [Gagne's] motion, [the group sex with Ruben Bermudez] doesn't fit the statute, [the invitation to David Stout] doesn't fit the statute, [another item] is withdrawn, [and the offer of group sex with Gagne's father] doesn't fit the statute. So none of those may be - - inquiry may not be made about any of those; only [the Tony's Lounge Incident and the sex toys].

The court granted Gagne's "Motion and Offer of Proof" in part, by admitting the first and third items (the Tony's Lounge Incident and the use of sex toys), and formalized this decision in an order filed January 17, 2001. The court denied the second and fifth items (the group sex with Bermudez and the offer of group sex with Gagne's father), along with some other proposed evidence. The court's basis for excluding each of these items was that it "doesn't fit the statute," meaning that because an item involved a third party (i.e., another *person*), it would not satisfy the § 750.520j(1)(a) exception for "[e]vidence of the victim's past sexual conduct *with the actor*." The trial court initially excluded the fourth item (the invitation to Stout) based on a misunderstanding of its nature, but then clarified that it would allow that item, as it was limited to events on the night in question. That testimony was ultimately admitted during trial.

Gagne moved immediately for reconsideration, arguing as to the second and fifth items (the group sex with Bermudez and the offer of group sex with Gagne's father) that Michigan case law, namely, *Michigan v. Hackett*, 365 N.W.2d 120 (Mich. 1985), supported its admission. In *Hackett*, the Michigan Supreme Court said that "specific instances of [a] complainant's past sexual conduct with third persons is ordinarily irrelevant and inadmissible to show consent," but for "extraordinary circumstance." *Id.*

at 128. In a footnote to the "extraordinary circumstance" caveat, the *Hackett* court noted that "[s]exual history might . . . be relevant where the victim has engaged in a prior pattern of behavior clearly similar to the conduct immediately in issue." *Id.* at 128 n.4 (quoting *United States v. Kasto*, 584 F.2d 268, 271 n.2 (8th Cir. 1978)). From this, Gagne argued for reconsideration and admission of these two items because they "establish as clear a pattern as can be imagined which is similar to what is alleged here as non-consensual conduct."

Gagne did not argue in his motion for reconsideration that the trial court had overlooked his constitutional right-to-confrontation claim, nor did he raise any other constitutional claim (e.g., fair-trial or complete-defense). The trial court denied the motion, finding no "palpable error" in its earlier decision and, thus, no basis upon which it could grant reconsideration.

## B.

On direct appeal to the Michigan Court of Appeals, Gagne[9] challenged the trial court's exclusion of the evidence regarding the group sex with Bermudez and the offer of group sex with Gagne's father, claiming that the court had (1) misinterpreted the Rape Shield Law and (2) misapplied the Rape Shield Law in a way that violated his constitutional rights.

Gagne first argued that the trial court misinterpreted the Michigan Rape Shield Law, specifically the exception in § 750.520j(1)(a) that allows for the admission of "[e]vidence of the victim's past sexual conduct with the actor," by limiting its scope to just those incidents of "the victim's past sexual activity with *only* the actor." Even though others were involved or present — be it Swathwood, Bermudez, or Gagne's father — each of the incidents in question included victim P.C. and defendant-actor Gagne and, therefore, satisfied the exception as written, i.e., "the victim's past sexual conduct with the actor." In Gagne's view, by excluding incidents on the basis that others

---

[9]Although we refer to only Gagne, both defendants appealed, raising similar claims, and the Michigan Court of Appeals consolidated the appeals. *See Swathwood*, 2003 WL 1880143 at *1.

were present in addition to the defendant-actor, the trial court improperly "read into the statute a general exclusion of [evidence of past incidents of] group sexual activity." Gagne argued that "[i]n the context of group sex involving the complainant, the defendant, and other parties, the presence of those other parties serves only to characterize the type of sex between the complainant and the defendant," and the exception, § 750.520j(1)(a), "is not concerned with the *type* of sexual activity." Or, as Gagne argued:

> The rape-shield law is designed to prevent Mr. Gagne from making the argument that because [P.C.] had previously consented to sex with other men she must have consented to sex with him on the night in question. However, evidence that [P.C.] previously consented to group sex with Mr. Gagne is clearly relevant to the issue of whether she consented to group sex with Mr. Gagne on the night in question. The proposed evidence [would have] had the tendency to make the existence of consent more probable than it would [have been] without the evidence.

Obviously, this omits from consideration the identity of any other participant in the group sex and, instead, defines "group sex" as just a type of sex or sex act, such as vaginal sex, oral sex, anal sex, rough sex, exhibitionist sex, etc. That is, by this reasoning, "the presence of those other parties" does not describe or alter the victim's perception of the "actor" (i.e., the victim's chosen partner or partners), but merely describes the *nature* of the sexual conduct between them.[10]

Gagne also argued that the trial court had misapplied the Michigan Rape Shield Law in violation of his "constitutional rights to a fair trial, to confront the complainant, and to present a [complete] defense." Gagne cited *Crane v. Kentucky*, 476 U.S. 683 (1986), *California v. Trombetta*, 467 U.S. 479 (1984), and *Washington v. Texas*, 388 U.S. 14 (1967), in support of this proposition, but also acknowledged that these rights are "not without limitation [and] may, in appropriate cases, bow to accommodate other

---

[10]Indeed, the Michigan Court of Appeals understood Gagne and Swathwood to be arguing "that the fact that [P.C.]'s and Gagne's sexual history included another person was merely an aspect or characteristic of their sexual relationship." *Swathwood*, 2003 WL 1880143 at *1. But it did not address this question and instead affirmed on another basis. *Id.* at *2 ("Even viewing the evidence as defendants urge, as merely an instance of prior sexual conduct with defendant, an aspect of which was the inclusion of other persons, the evidence is not automatically admissible.")

legitimate interests in the criminal trial process," quoting *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (editorial and quotation marks omitted) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987).[11]   Gagne then pointed the court to Michigan case law for the proposition that the State's legitimate interest in limiting the admission of evidence must be "balanced against the fundamental requirements of the [C]onstitution," *Michigan v. Redmon*, 315 N.W.2d 909, 914 (Mich. Ct. App. 1982) (citing *Davis v. Alaska*, 415 U.S. 308 (1974)), and argued that, while the State's interest in its rape-shield law might be sufficiently compelling when the evidence is of minimal probative value, "[a]s to evidence of high probative value, . . . no state interest can be compelling enough to preclude its introduction," quoting *Washington v. Hudlow*, 659 P.2d 514, 523 (Wash. 1983) (citing *Redmon*).   Gagne insisted that testimony about group sex with Bermudez and the offer of group sex with Gagne's father was highly probative:

> The probative value of the proffered evidence to the issue of consent was especially weighty because of the nature of the sexual activity in question. The idea that a woman would have sex with two or more men at the same time strikes most people as bizarre and a jury, therefore, [would] be inclined to view a consent defense in a case like this one with inherent disbelief. The evidence of past consensual group sexual activity is relevant to show that the charged incident in question occurred consensually, as [the defendants] testified it did, rather than as [P.C.] stated.

To support his argument, Gagne analogized his case to three Michigan court cases, *see Michigan v. Perkins*, 379 N.W.2d 390 (Mich. 1986); *Michigan v. Williams*, 330 N.W.2d 823 (Mich. 1982); *Michigan v. Zysk*, 386 N.W.2d 213 (Mich. Ct. App. 1986), and discussed two cases in which "[o]ther states have . . . interpreted their own rape shield statutes to allow evidence of past consensual group sex activity that included the victim and defendant"; *see South Dakota v. Blalack*, 434 N.W.2d 55 (S.D. 1988), and *California v. Keith*, 173 Cal. Rptr. 704 (Cal. Ct. App. 1981).   Gagne concluded his argument on his constitutional claim with this paragraph:

---

[11]Gagne did not cite either *Chambers v. Mississippi*, 410 U.S. 284 (1973), or *Olden v. Kentucky*, 488 U.S. 227 (1988), in his brief to the Michigan Court of Appeals. Nor did the Michigan Court of Appeals cite either in its opinion.

> Given the remarkable similarity of the proposed evidence of past consensual group sex involving [P.C.] and Mr. Gagne to the episode of group sex that [P.C.] alleged was non-consensual, the evidence at issue here was highly probative of the issue of her consent on the night in question. The probative nature of the evidence far outweighed its prejudicial effect and would have illuminated for the jury the nature of [P.C.]'s and Gagne's sexual relationship. Because the proffered evidence was so probative on the issue of consent and because it was not overly prejudicial in any way that would implicate a compelling state interest, it should have been admitted to allow Lewis Gagne to confront [P.C.]'s testimony and to establish his defense.

Essentially, Gagne's "constitutional" argument to the Michigan Court of Appeals was that the probative value of the evidence far outweighed its prejudicial effect.[12]

The Michigan Court of Appeals began its analysis by quoting the Rape Shield Law, M.C.L. § 750.520j(1), but acknowledged that "[i]n certain limited situations, evidence that does not come within the specific exceptions of the statute may be relevant and its admission required to preserve a criminal defendant's Sixth Amendment right of confrontation." *Swathwood*, 2003 WL 1880143 at *1. Consequently, the court looked to three cases from the Michigan Supreme Court: *Michigan v. Arenda*, 330 N.W.2d 814 (Mich. 1982), *Michigan v. Hackett*, 365 N.W.2d 120 (Mich. 1984), and *Michigan v. Adair*, 550 N.W.2d 505 (Mich. 1996), all of which considered Sixth Amendment challenges to a trial court's exclusion of evidence pursuant to the Michigan Rape Shield Law.

In *Arenda*, 330 N.W.2d at 815, the defendant was charged with "sexual assaults upon his eight-year-old son[,] during which the boy was made to perform acts of fellatio," *id*. at 819 (Kavanagh, J., dissenting); *see also Michigan v. Arenda*, 296 N.W.2d 143, 145 (Mich. Ct. App. 1980) (intermediate appellate court decision overruled on other grounds). The defendant "denied participating in the alleged acts of fellatio, claiming that he was not with his son when the acts occurred." *Arenda*, 296 N.W.2d at 145. The

---

[12]In fact, one might reasonably consider this less a "constitutional" argument than an argument about the application of the Michigan Rape Shield Law, which contains the provision: "unless and only to the extent that the judge finds that . . . its inflammatory or prejudicial nature does not outweigh its probative value," M.C.L. § 750.520j(1).

prosecution's case was founded solely on the eight-year-old victim's uncorroborated testimony, but the persuasiveness of that testimony was enhanced considerably by the child's ability to describe the sex acts in great detail. *See Arenda*, 330 N.W.2d at 817; *id*. at 820 (Kavanagh, J., dissenting) ("At trial, the prosecutor introduced evidence of prior sexual conduct between the victim and defendant to show that the ability of the youthful victim to explicitly describe fellatio was a result of having been forced by defendant to perform it."). In response, the defendant sought to introduce evidence of the boy's past, similar sexual conduct with others, to explain how this eight-year-old boy could "describe vividly and accurately the sexual acts that allegedly occurred." *Id*. at 815. The defendant argued that this evidence was indispensable to his defense, as it was his only means of answering the question that the prosecutor had placed in the mind of every juror: How else could the child have come by such detailed knowledge? *See id*. The trial court excluded this evidence pursuant to the Rape Shield Law and, upon conviction, the defendant appealed. The Michigan Court of Appeals affirmed this part of the trial court's decision succinctly, holding that "information about the child's alleged outside sexual encounters does not fall within either exception" to the Rape Shield Law. *Arenda*, 296 N.W.2d at 145. On appeal to the Michigan Supreme Court, the defendant claimed that the Rape Shield Law's "prohibitions infringe[d] upon his Sixth Amendment right of confrontation." *Arenda*, 330 N.W.2d at 815; *see also id*. at 821 (Kavanagh, J., dissenting). The dissent agreed with the defendant, arguing that the Rape Shield Law's "categorical exclusion," without proper consideration of context, of "evidence of a victim's sexual conduct with persons other than the defendant," was unconstitutional. *Id*. at 823 (Kavanagh, J., dissenting). The majority, however, found that defense counsel had cross-examined the victim about possible sexual contact with others (which the victim denied) and had failed to proffer evidence that the alleged prior acts had actually occurred. *Id*. at 818. The majority held that the Rape Shield Law was not unconstitutional on its face, *id*. at 815, and that "there [was] no basis on th[e] record for the conclusion that [the] defendant was denied the right of confrontation," *id*. at 818. Therefore, the Michigan Supreme Court upheld the exclusion of the evidence.

In *Hackett*, 365 N.W.2d at 122-23, the Michigan Supreme Court considered the constitutionality of the Michigan Rape Shield Law in a consolidated appeal from two separate cases involving the trial courts' exclusion of evidence of the victims' prior sexual conduct, over the defendants' protests that such exclusion violated their Sixth Amendment rights to confrontation and cross-examination. In the first sub-case, defendant Hackett, a black man incarcerated at a Michigan correctional facility, was charged with forcing the victim, a white male inmate, to submit to forced anal intercourse. *Id.* at 126-27; *id.* at 128-29 (Kavanagh, J., concurring); *id.* at 132 (Levin, J., dissenting). Hackett claimed consent and "sought to introduce specific instances of the complainant's prior homosexual conduct with [other black] prisoners . . . to circumvent the inference that it would be improbable that a white male prisoner would consent to sodomy by a black male prisoner." *Id.* at 126.[13] The Michigan Court of Appeals reversed and vacated the conviction, holding that the exclusion of the victim's sex-history evidence denied Hackett a fair trial. *Id.* at 130 (Kavanagh, J., concurring). In the other sub-case, defendant Paquette and his co-defendant were charged with forcing the victim — a married woman, five months pregnant, whom they had picked up on the highway after her car had run out of gas — to undress and "perform various sexual acts with them[,] by threatening to hurt her and her unborn baby." *Michigan v. Paquette*, 319 N.W.2d 390, 391 (Mich. Ct. App. 1982); *Hackett*, 365 N.W.2d at 128; *id.* at 129 (Kavanagh, J., concurring); *id.* at 133 (Levin, J., dissenting). Paquette claimed consent and sought to introduce evidence that, on a night shortly before the incident, the victim had "allegedly met a man in a bar and left with him for consensual sexual

---

[13]*See also id.* ("Defendant [Hackett] also claims that evidence of the complainant's reputation for, or specific acts of, homosexual conduct, with black male prisoners in particular, should have been admitted as necessary to establish his defense of consent. Defendant [Hackett] argues that such evidence would have made it more probable for the jury to believe that the complainant, a white male prisoner, consented to or solicited the act of sodomy with the defendant, a black male prisoner."); *id.* at 129 (Kavanagh, J., concurring) ("The evidence was also needed, argued [Hackett's] defense counsel, to circumvent an assumption that it would be improbable that a white male prisoner would consent to sodomy by a black male prisoner."); *id.* at 133 (Levin, J., dissenting) ("Hackett's written motion for admission of the evidence asserted that it was relevant to show that the complainant would be likely to consent to or solicit sexual contact with Hackett, to rebut the assumption that a white man would not consent to or solicit sodomy by a black man, and to impeach the complainant's preliminary examination testimony denying that he was a homosexual.").

relations in a motel." *Id*. at 127.**14**   The Michigan Court of Appeals affirmed the exclusion of the evidence and upheld the conviction. *Paquette*, 319 N.W.2d at 392.

On appeal to the Michigan Supreme Court, the prosecution argued that the Michigan Rape Shield Law compelled the court to exclude the evidence; the defendants argued that the Constitution compelled the court to admit it. *Hackett*, 365 N.W.2d at 122. The dissent argued that:

> The procedures in the instant cases violated the defendants' rights to confrontation and compulsory process and denied them fair trials and due process of law. In *Hackett*, the proffered evidence was relevant to rebut jury assumption and inference that a white man would not solicit or consent to an act of sodomy by a black man   .... In *Paquette*, the evidence was relevant to rebut jury assumption and inference that a married, pregnant woman does not seek to engage in casual sexual relations.

*Id*. at 135-36 (Levin, J., dissenting) (paragraph breaks and footnote omitted). Specifically:

> The defendants are properly concerned that the jurors will see the complaining witnesses as persons who are not likely to have consented to the sexual acts, not because they are chaste persons ... but because ... the charged sexual behavior is, in the jurors' experience, 'aberrant.' It is 'aberrant' for a married, pregnant woman to be looking for casual sex and it is 'aberrant' for a white man to solicit or consent to a sexual relationship with a black man. At least that is what most jurors will think.

*Id*. at 135 (Levin, J., dissenting). But the majority was not persuaded. Concerning Hackett:

> [A] close[] question is presented where such evidence was sought to dispel the assumption that most jurors would believe such an act, especially given the interracial element, is not likely to occur voluntarily. Nevertheless, we do not believe [the] defendant was denied his

---

**14***See also id.* at 129 (Kavanagh, J., concurring) ("[Paquette] also sought to introduce testimony of what he said was a circumstance similar to the one for which [he] was on trial, that shortly before the incident alleged the complainant had met a man in a bar and left with him to enjoy sexual relations that night in a motel."); *id*. at 133-34 (Levin, J., dissenting) ("Paquette sought to introduce evidence . . . that [the victim] had engaged in consensual sexual relations with a stranger that she had met in a bar . . . . The evidence was offered as relevant on the issue of consent.").

constitutional right to confrontation since he had a reasonable opportunity to introduce evidence which would have permitted a discriminating appraisal of [the] complainant's possible consent. Evidence of a specific instance of alleged homosexual conduct between complainant and a black male inmate occurring three days before the incident in question was brought out at trial as well as evidence of two stains of seminal fluid which may have been from more than one person. The defendant was not denied his right to confrontation since he was given the opportunity, even though limited in fashion, to expose to the jury the complainant's past homosexual encounter with a prisoner of the same race as defendant as tending to show his consent in this instance.

*Id*. at 127.  Concerning Paquette, the court concluded:

[T]here are no extraordinary circumstances disclosed in the record to take this case out of the general rule of inadmissibility.  The fact that [the] complainant may have consented to sexual activity at some time in the past with a man other than the defendant, whom she met in a bar and accompanied to a motel, is not sufficiently similar to the facts at hand to be relevant to the issue of consent.  Here, the simultaneous sexual acts between complainant and two strangers, one of whom was the defendant, occurred in the cab of a truck after the strangers had picked up the complainant on the road near her car which had run out of gas.  Moreover, complainant's alleged reputation for engaging in consensual sexual relations in the past, does not tend to prove that she did so with defendant at the time in question.

*Id*. at 128.  Therefore, the Michigan Supreme Court rejected the proposition that the Sixth Amendment compelled the admission of evidence because, without it, the jury would likely view the particular sexual conduct as "aberrant" and assume that the victim would not consent to it.

In *Adair*, 550 N.W.2d at 507-08, the defendant was charged with sexually assaulting his wife by "digital-anal penetration," and sought to introduce evidence that "digital-anal sexual activity was common practice in the couple's marriage."  The trial court excluded this evidence and the Michigan Court of Appeals affirmed.  *Id*. at 508. The Michigan Supreme Court characterized this evidence by "its highly prejudicial nature and its nonexistent probative value" and agreed that it was properly excluded.  *Id*. at 513.  But the dissent disagreed with the majority's characterization:

[E]vidence of past consensual atypical sexual conduct is relevant to negat[e] the inferences jurors might draw, on their own initiative, absent such evidence, [such as] that the incident must have occurred as the complainant testified, because [a juror] could not have imagined such abnormal sexual conduct, or [a juror might imagine] that this abnormal sexual conduct is just the kind of hostile behavior an estranged husband would perpetrate on his wife to humiliate and subjugate her.

*Id*. at 513 n.2 (Levin, J., dissenting).

Digital-anal sex may or may not be part of the sexual experience of one or more of the jurors who shall be empaneled to try this case. To the extent that it is, the evidence of past consensual digital-anal sex is less prejudicial; to the extent it is not, such evidence is more probative, especially for jurors who may have had little or no experience with digital-anal sex and who, on the basis of such inexperience, might regard digital-anal sex as deviant sexual behavior, and who might conclude — absent the evidence that the complainant and the defendant had consensually engaged on a number of occasions in such atypical sexual conduct — that a woman (the complainant) would not consent to such a penetration of her body.

*Id*. at 513-14 (Levin, J., dissenting). The majority was, apparently, not persuaded.

In the present case, the Michigan Court of Appeals framed Gagne's argument thus: Gagne and Swathwood "argue that without this evidence that group sex was not foreign to [P.C.], the jury likely would reject a consent defense because the incident involved more than one partner." *Swathwood*, 2003 WL 1880143 at *2. The court rejected this argument, explaining:

[E]vidence of a victim's prior sexual conduct with [a] defendant is only admissible if and to the extent that the judge finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. [P.C.]'s willing participation in a threesome with Gagne and Bermudez is not probative of whether she consented to a threesome with Gagne and Swathwood on the night of the alleged offense. [T]he threesome involving Bermudez occurred while [P.C.] and Gagne were still dating. The instant offense occurred after they had ended their relationship and it involved Swathwood, not Bermudez. In light of the lack of similarity between the Bermudez threesome and the instant offense, we conclude that the trial court did not abuse its discretion in excluding the evidence.

*Id.* (quoting M.C.L. § 750.520j(1)) (quotation and editorial marks omitted; other citations omitted).

The Michigan Court of Appeals also rejected Gagne's argument that the trial court erred by excluding testimony of P.C.'s "expressed desire to engage in group sex with Gagne and his father":

> Although the conduct involved defendant Gagne, like the evidence of the threesome with Bermudez, the evidence is not probative of whether [P.C.] consented in the instant matter to engage in sexual relations with Gagne and Swathwood. . . . [T]he evidence was not relevant to the issue of consent, and . . . the trial court did not abuse its discretion in excluding the evidence.
>
> Moreover, in light of the other evidence of [P.C.]'s past sexual conduct that the trial court did admit, we reject [the] defendants' argument that their [Sixth Amendment] rights of confrontation compelled the admission of this evidence and take note of the evidence that the trial court did admit. The jury heard about 'The Tony's Lounge Incident,' in which [the] defendants, [P.C.], and two other women engaged in group sex, according to [the] defendants' version of the incident. [The] [d]efendants further testified that the incident included [P.C.] performing oral sex on Swathwood. Even [P.C.] testified that[,] after The Tony's Lounge Incident[,] Gagne told her that she had engaged in oral sex with Swathwood, but she was unable to recall whether she had done so because she was intoxicated. Therefore, [the] defendants presented evidence that [P.C.] was not averse to group sexual activity.

*Id.* at *3. The Michigan Court of Appeals also rejected the several other claims, including prosecutorial misconduct and ineffective assistance, and affirmed the convictions and sentences.

Gagne sought leave to appeal to the Michigan Supreme Court, but was denied. *Michigan v. Gagne*, 673 N.W.2d 755 (Mich. Dec. 29, 2003). That exhausted his possible state remedies.

## C.

On December 29, 2004, Gagne filed an eight-page, *pro se* petition for a writ of *habeas corpus* in the United States District Court for the Eastern District of Michigan.

Gagne raised three claims he had raised in the state courts — improper exclusion of evidence, prosecutorial misconduct, and ineffective assistance of counsel — and appended a copy of the brief his counsel had filed in the Michigan Court of Appeals as the brief in support of his *habeas* petition.[15] The State responded that the first aspect of the improper-exclusion-of-evidence claim — that the Michigan Court of Appeals had misinterpreted the Michigan Rape Shield Law — was a state-law issue and, therefore, not cognizable on federal *habeas*. The State addressed the constitutional aspect of the improper-exclusion-of-evidence claim by pointing out that a criminal defendant's right to present evidence is not unlimited, and argued that the Michigan courts had been correct to conclude that P.C.'s past sexual acts with others was "legally irrelevant" to her accusation of Gagne, such that the Sixth Amendment was not even implicated.[16]

The district court began its analysis by acknowledging that the Antiterrorism and Effective Death Penalty Act (AEDPA) applies in this case and, under AEDPA, a federal court may not grant a writ unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or "was based on an unreasonable determination of facts in light of the evidence presented in the state court proceeding." *Gagne v. Booker*, No. 04-60283, 2007 WL 1975035 at *3, 2007 U.S. Dist. LEXIS 47616 (E.D. Mich. July 2, 2007) (quoting 28 U.S.C. § 2254(d)(1)-(2)). The district court then explained what is meant by "contrary to" and "unreasonable application of" clearly established federal law. *Id*. And the district court expressly declined to consider Gagne's claim that the Michigan Court of Appeals had misinterpreted the Michigan Rape Shield Law because that state-law claim was not cognizable on federal *habeas* review. *Id*. at *5 ("Whether the state courts

---

[15]Recall that, in this brief, Gagne did not cite *Chambers* or *Olden*, and only cited *Crane* for the general proposition that an accused is entitled to present a complete defense. *See* n.11, *supra*.

[16]The State did not cite or refer to *Crane v. Kentucky* even one time in its response. That is because Gagne had not pointed to *Crane* as the clearly established federal law that he was claiming the Michigan Court of Appeals had unreasonably applied. The State did not cite to *Olden* in its response either, and cited *Chambers* only in a parenthetical to *United States v. Torres*, 937 F.2d 1469, 1474 (9th Cir. 1991), which it cited for the proposition that "the right to present a defense is not absolute and may have to bow to accommodate other legitimate interests in the criminal trial process."

correctly applied their own rape shield law is, by itself, of no concern to a federal habeas court."  (citation omitted)).

The district court granted the writ based on Gagne's claim that, by excluding the testimony regarding the group sex with Bermudez and the offer of group sex with his father, the Michigan Court of Appeals had violated his Sixth Amendment rights to a fair trial, to confront the witnesses against him, and to present a complete defense. *Id*. at *5-9. Despite the district court's acknowledgment of AEDPA's application and the AEDPA standard, it is far from clear from the opinion just what "clearly established federal law" the court was referring to or relying on, or exactly how the Michigan Court of Appeals had contradicted or unreasonably applied it.  *See id*.  The district court apparently considered circuit and district court cases to be representative of "clearly established Supreme Court precedent"; more importantly, the district court conducted a plenary review.  *See id.*  The district court's concluding paragraph on this issue is representative of its overall analysis:

> The [c]ourt concludes that [Gagne]'s right to a fair trial and his right to present a full and meaningful defense were violated by his inability to introduce additional facts about [P.C.]'s conduct.  The omitted evidence might have created a reasonable doubt that did not otherwise exist, and it might have altered the jury's impression of [P.C.]'s credibility. Therefore, the state court's decision resulted in a decision that was contrary to, or an unreasonable application of, clearly established federal law.  Well-established constitutional principles required the trial court to balance the State's interest in excluding evidence against [Gagne]'s right to present a defense and to establish his innocence. *Johnson v. Moore*, 472 F. Supp. 2d 1344, 1363 (M.D. Fla. 2007).  The Constitution also required the trial court, if [Gagne]'s interest were greater, to receive testimony notwithstanding the [Michigan Rape Shield Law]. *Id*.

*Id*. at *9.  In this one paragraph, the district court offers its own opinion on the value of the withheld evidence, fails to state any authority for its assertion of "clearly established federal law," and relies (twice) on a Florida District Court case for its concluding propositions of law.

To be sure, the district court did cite seven Supreme Court cases. The district court cited *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973), for the basic proposition that "the right to confront and cross-examine witnesses and to call one's own witnesses is fundamental to a defendant's due process rights." *Gagne*, 2007 WL 1975035 at *5. Similarly, the district court cited *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)), for this unremarkable principle: "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *See id.* at *5. Notably, the Supreme Court issued *Holmes* on May 1, 2006 — over three full years *after* the Michigan Court of Appeals decided Gagne's appeal on April 15, 2003 — and this parenthetical citation to *Crane*'s quote-within-the-quote is the only reference to *Crane* anywhere in the district court's opinion. The district court quoted *Pennsylvania v. Ritchie*, 480 U.S. 39, 51 (1987), in stating its proposition that "[t]he [Sixth] Amendment provides a criminal defendant with 'the right physically to face those who testify against him, and the right to conduct cross-examination," and *Alford v. United States*, 282 U.S. 687, 694 (1931), for the proposition that "a trial court abuses its discretion when it completely bars exploration of a relevant subject on cross-examination." *Id.* at *6. The district court cited *Chapman v. California*, 386 U.S. 18, 87 (1967), for the harmless-error standard, *id.*, and *Olden v. Kentucky*, 488 U.S. 227, 232-33 (1988), as an example of a case in which a defendant, accused of rape, was entitled to introduce certain evidence concerning his accuser's sexual history, despite the rape-shield law, because that evidence would have supported the accuser's motive to lie and "might have altered the jurors' impression of the [accuser]'s credibility." *Id.* at *8. But these seven citations pale in comparison to the citations to, expositions of, and reliance on the numerous circuit court cases.

As evidenced by the forgoing propositions and corresponding Supreme Court citations, the district court's opinion contains no explanation of how the Michigan Court of Appeals contradicted or unreasonably applied clearly established Supreme Court precedent in Gagne's case, or just what that precedent was. Also missing from the district court's version of the "clearly established law" is any recognition that the defendant's Sixth Amendment rights are not absolute. *See Lucas*, 500 U.S. at 152-53

(considering Michigan's Rape Shield Statute under a prior constitutional challenge); *Taylor v. Illinois*, 484 U.S. 400, 410-11 (1988) (noting that the Sixth Amendment Compulsory Process Clause does not grant defendants the unfettered right to offer testimony); *Chambers*, 410 U.S. at 295 (clarifying that a defendant's right to confront and cross-examine witnesses may have to "bow to accommodate other legitimate interests in the criminal trial process").

**D.**

The State appealed the district court's grant of the writ, arguing that the evidence was only minimally relevant and would have been cumulative because the trial court had admitted evidence of P.C.'s prior participation in group sex with Gagne and Swathwood when it admitted the testimony about the Tony's Lounge Incident. Therefore, argued the State, the Michigan courts had properly excluded the other evidence of group sex (with Bermudez and Gagne's father) and, even if they erred by excluding it, any error was harmless in light of the evidence that was admitted.

In his brief, Gagne did as the district court had done and relied primarily on circuit and district court cases. Gagne omitted any AEDPA analysis — he did not specifically identify any controlling Supreme Court precedent, nor did he specify how the Michigan Court of Appeals had contradicted or unreasonably applied any such precedent. One passage is particularly noteworthy:

> By depriving Lewis Gagne of his ability to present relevant and material evidence directly bearing on his consent defense, the [Michigan state] trial court violated his Due Process right to a fair trial. *Crane v. Kentucky*, 476 U.S. 683, 690-91, 106 S. Ct. 2142, 2146-47 (1986), *and cases cited therein. See also Johnson v. Moore*, *supra*, 472 F. Supp.2d at 1356-60 (right to present complete defense is clearly established in United States Supreme Court decisions).

Appellee Br. at 23 (Dec. 17, 2008).  This was Gagne's only citation to *Crane* anywhere in his brief.[17]

A Sixth Circuit panel affirmed the district court, holding that "the exclusion of evidence . . . was an unreasonable application of the principles set forth by the Supreme Court in *Crane*."  *See Gagne v. Booker*, 606 F.3d 278, 288-89 (6th Cir. 2010).[18]  The State sought *en banc* rehearing, which we granted.  In its brief to the *en banc* court, the State argued that "[t]here is no clearly established Supreme Court law that required the Michigan courts to admit the excluded evidence on constitutional grounds," inasmuch as "[t]he decision in *Crane v. Kentucky* involved claims very different in character to those presented here."  Appellant Br. at 2 (Aug. 19, 2010) (footnote omitted).  Gagne responded that "*Lucas* and *Crane* converge to provide the principle under which the district court and the panel granted . . . habeas relief."  Appellee Br. at 6 (Sept. 20, 2010).

### III.

Because Gagne filed his *habeas* petition in December 2004, we apply the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214, *codified at* 28 U.S.C. § 2254 *et al*.  Under AEDPA, we review the last state court decision adjudicated on the merits, to determine whether that decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts."  28 U.S.C. § 2254(d)(1)-(2).

Gagne claims that the Michigan Court of Appeals unreasonably applied the principles announced in *Michigan v. Lucas*, 500 U.S. 145 (1991), and *Crane v. Kentucky*, 476 U.S. 683 (1986).  Gagne does not claim that the decision was contrary to

---

[17]Gagne did not cite *Chambers* at all, and he cited *Olden* only for the proposition that the jury "might have received a significantly different impression" if the excluded evidence had been presented. Appellee Br. at 19.

[18]Neither the majority opinion nor the concurrence cited either *Chambers* or *Olden*.

the fact-specific outcomes in either of those cases (or any others), nor does he allege any unreasonable determination of fact.[19]

---

[19]Judge Kethledge argues in dissent that we should find the Michigan Court of Appeal's decision to be "*contrary to*" the clearly established holdings of three Supreme Court decisions: *Chambers v. Mississippi*, 410 U.S. 284 (1973), *Crane v. Kentucky*, 476 U.S. 683 (1986), and *Olden v. Kentucky*, 488 U.S. 227 (1988). But we cannot.

There are "two scenarios" in which a "state-court decision falls within [§ 2254(d)(1)]'s 'contrary to' clause": (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases"; or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

None of the three Supreme Court cases that Judge Kethledge cites could be considered "governing law" as to the issue before us here — i.e., the application of Michigan's Rape Shield Law and the constitutional limits thereon. The first case, *Chambers*, 410 U.S. at 294, concerned Mississippi's hearsay and voucher rules. The next, *Crane*, 476 U.S. at 687, concerned Kentucky's procedure of barring evidence about the voluntariness of a defendant's pre-trial confession. And *Olden*, 488 U.S. at 232, concerned a state trial court's exclusion of evidence based on improper "[s]peculation as to the effect of juror's racial biases." None of these holdings directly governs the present issue. *See Premo v. Moore*, 562 U.S. --, 131 S. Ct. 733, 743 (2011) (explaining that, under AEDPA's "contrary to" analysis, a federal habeas court may not "transpose[] [a Supreme Court holding] into a novel context").

Nor do we believe that Judge Kethledge is suggesting as much. Instead, Judge Kethledge finds that the present "case is indistinguishable from *Chambers*"; that "[t]he analysis flows in the same channels here" as in *Crane*; and that, "in this case, the Michigan Court of Appeals confronted a 'set of facts that are materially indistinguishable from' [those in] a decision of the Supreme Court, namely *Olden*." *See* Kethledge, J., Dissenting, *infra*. To be sure, Judge Kethledge has painstakingly applied the present facts to the circumstances of those Supreme Court cases, drawn clever analogies between the factual underpinnings, and argued that the facts of this case should lead to the same outcomes as those cases. But the present facts are clearly distinguishable from a case about a third-party confession (*Chambers*), a case about a defendant's allegedly coerced confession (*Clay*), or a case about a rape victim's interracial relationship (*Olden*).

Judge Kethledge has applied the holdings of those three Supreme Court cases to the present facts, and has done so persuasively. But that does not demonstrate that the outcome is "contrary to" the holdings of those cases. Which is to say that the "contrary to" and "unreasonable application" clauses are different things, with independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams*, 529 U.S. at 405). As the Supreme Court explained in *Williams*:

"On the other hand, a run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause. Assume, for example, that a state-court decision on a prisoner's ineffective-assistance claim correctly identifies *Strickland* as the controlling legal authority and, applying that framework, rejects the prisoner's claim. Quite clearly, the state-court decision would be in accord with our decision in *Strickland* as to the legal prerequisites for establishing an ineffective-assistance claim, even assuming the federal court considering the prisoner's habeas application might reach a different result applying the *Strickland* framework itself. It is difficult, however, to describe such a run-of-the-mill state-court decision as 'diametrically different' from, 'opposite in character or nature' from, or 'mutually opposed' to *Strickland*, our clearly established precedent. Although the state-court decision may be contrary to the federal court's conception of how *Strickland* ought to be applied in that particular case, the decision is not 'mutually opposed' to *Strickland* itself.

"Justice STEVENS would instead construe § 2254(d)(1)'s 'contrary to' clause to encompass such a routine state-court decision. That construction, however, saps the 'unreasonable application' clause of any meaning. If a federal habeas court can, under the 'contrary to' clause, issue the writ whenever it concludes that the state court's application of clearly established federal law was incorrect, the 'unreasonable application' clause becomes a nullity. We must, however, if possible, give meaning to every clause of the statute. Justice STEVENS not only makes no attempt to do so, but also construes the 'contrary to' clause in a manner that ensures that the 'unreasonable

## A.

A state court "unreasonably applies" clearly established law when its ruling is "so lacking in justification that [the] error [is] well understood and comprehended in existing law[,] beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. --, 131 S. Ct. 770, 786-87 (2011); *see also Williams v. Taylor*, 529 U.S. 362, 409 (2000) ("objectively unreasonable").

Importantly, "an *unreasonable* application of federal law is different from an *incorrect* application of federal law . . . [and] [t]his distinction creates a substantially higher threshold for obtaining relief than [would] *de novo* review." *Renico v. Lett*, 559 U.S. --, 130 S. Ct. 1855, 1862 (2010) (quotation marks omitted). In fact, "[i]t is not necessary . . . to decide whether the [state court]'s decision — or, for that matter, the trial judge's [decision] — was right or wrong . . . . [W]hether the trial judge was right or wrong is not the pertinent question under AEDPA." *Id.* at 1865 n.3. And the possibility that the federal *habeas* court might "conclude[] in its independent judgment that the [state court] applied clearly established federal law erroneously or incorrectly" is wholly irrelevant. *See Williams*, 529 U.S. at 411. "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington*, 131 S. Ct. at 786.

Because "[a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system," *Miller–El v. Cockrell*,

application' clause will have no independent meaning. We reject that expansive interpretation of the statute. Reading § 2254(d)(1)'s 'contrary to' clause to permit a federal court to grant relief in cases where a state court's error is limited to the manner in which it applies Supreme Court precedent is suspect given the logical and natural fit of the neighboring 'unreasonable application' clause to such cases."

*Williams*, 529 U.S. at 406-07 (internal citations omitted).

Even if we were to assume for the sake of argument that the Michigan Court of Appeals's decision in the present case — to exclude evidence of the victim's past willingness to engage in consensual group sex — is inconsistent with the principles established by the Court in *Chambers*, *Clay*, and *Olden*, the decision is not "mutually opposed to [*Chambers*, *Clay*, or *Olden*] itself." *Chambers* itself specifically protects a defendant's right to introduce evidence about a third-party's confession to the charged murder. *Clay* specifically protects a defendant's right to introduce evidence about the circumstances surrounding his own confession to the charged murder. And *Olden* specifically protects a defendant's right to introduce a witness's inter-racial relationship as evidence of that witness's bias or motive to lie, even if the trial court thinks the jurors' racial biases will prejudice the jury against that witness.

Judge Kethledge has effectively adopted Justice Stevens's view of the "contrary to" clause — a view rejected by a majority of the Supreme Court in *Williams*. We are not at liberty to join him.

537 U.S. 322, 340 (2003), "AEDPA . . . imposes a highly deferential standard [on the federal courts] for evaluating state-court rulings, and demands that state-court decisions be given the benefit of the doubt," *Renico*, 130 S. Ct. at 1862 (quotation marks omitted). Even in the case of a summary denial, when the state court has not fully explained the rationale for its decision, the reviewing "habeas court must determine what arguments or theories could have supported the state court's decision; and then it must ask whether it is possible [that] fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior [Supreme Court] decision." *Cullen v. Pinholster*, 563 U.S. --, 131 S. Ct. 1388, 1402 (2011) (quotation marks and editorial marks omitted).

Moreover, "[e]valuating whether a rule application was unreasonable requires considering the rule's specificity." *Harrington*, 131 S. Ct. at 786. "The more general the rule at issue — and thus the greater the potential for reasoned disagreement among fair-minded judges — the more leeway state courts have in reaching outcomes in case-by-case determinations." *Renico*, 130 S. Ct. at 1864 (editorial and quotation marks omitted). "[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court." *Harrington*, 131 S. Ct. at 786 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 129 S. Ct. 1411, 1419 (2009) (quotation marks omitted)).

"If this standard is difficult to meet, that is because it was meant to be." *Harrington*, 131 S. Ct. at 786. Indeed, "[s]ection 2254(d) reflects the view that *habeas corpus* is a guard against *extreme malfunctions* in the state criminal justice systems, not a substitute for ordinary error correction through appeal." *Id*. (quotation marks and citation omitted; emphasis added).

## B.

Gagne contends that the Michigan Court of Appeals unreasonably applied the principles clearly established in *Lucas* and *Crane* when it affirmed the trial court's exclusion of the testimony and questioning about the alleged group sex with Bermudez and the alleged offer of group sex with Gagne's father. *Lucas*, 500 U.S. at 152-53, stands for the proposition that the trial court must balance a state's interest in excluding

certain evidence under the rape shield statute against a defendant's constitutionally protected interest in admitting that evidence, on a case-by-case basis — neither interest is superior *per se*. And *Crane*, 476 U.S. at 690-91, stands for the general proposition that "the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense"— such that the court may not "exclude competent, reliable evidence . . . central to the defendant's claim of innocence[,] . . . [i]n the absence of any valid state justification."

The Michigan Court of Appeals did not cite *Lucas* or *Crane* by name, but identified the governing principles nonetheless, stating: "Application of the rape-shield statute must be done on a case-by-case basis, and the balance between the rights of the victim and the defendant must be weighed anew in each case." *Swathwood*, 2003 WL 1880143 at *1. Moreover, "[i]n certain limited situations, evidence that does not come within the specific exceptions of the [rape-shield] statute may be relevant and its admission required to preserve a criminal defendant's Sixth Amendment right of confrontation." *Id.* And, "[i]n exercising its discretion, the trial court should be mindful of the significant legislative purposes underlying the rape-shield statute and should always favor exclusion of evidence of a complainant's sexual conduct where its exclusion would not unconstitutionally abridge the defendant's right to confrontation." *Id.* (quotation marks omitted).

The Michigan Court of Appeals then analyzed this particular evidence by weighing its probative value against its prejudicial effect, and the State's interest against the defendant's:

> The rape-shield statute generally precludes admission of evidence of a victim's past sexual conduct with others, while excepting instances of a victim's past sexual conduct with the defendant to the extent it is relevant and not unfairly []prejudicial. In this case, the prior sexual conduct in question involves both 'others', (i.e., Ruben Bermudez) and defendant Gagne. Defendants argue that the complainant's prior consensual participation in a threesome with Gagne tends to show that the complainant is not averse to such conduct, which is probative of whether she consented in the instant case. The trial court was concerned that although the threesome was indeed prior sexual conduct with

defendant, it also involved a nonactor, Bermudez. Defendants argue that the fact that the complainant's and Gagne's sexual history included another person was merely an aspect or characteristic of their sexual relationship. Defendants argue that without this evidence that group sex was not foreign to the complainant, the jury likely would reject a consent defense because the incident involved more than one partner.

We disagree. Even viewing the evidence as defendants urge, as merely an instance of prior sexual conduct with defendant, an aspect of which was the inclusion of other persons, the evidence is not automatically admissible. Rather, evidence of a victim's prior sexual conduct with defendant is only admissible if and to the extent that the judge finds that the evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value. Here, the complainant's willing participation in a threesome with Gagne and Bermudez is not probative of whether she consented to a threesome with Gagne and Swathwood on the night of the alleged offense. Notably, the threesome involving Bermudez occurred while the complainant and Gagne were still dating. The instant offense occurred after they had ended their relationship, and it involved Swathwood, not Bermudez. In light of the lack of similarity between the Bermudez threesome and the instant offense, we conclude that the trial court did not abuse its discretion in excluding the evidence.

Defendants also argue that the trial court erred in excluding evidence that the complainant invited Gagne and his father to participate in a threesome. We disagree.

The evidence that the complainant expressed a desire to have a threesome with Gagne and his father is a statement that may also be conduct. . . . Although the conduct involved defendant Gagne, like the evidence of the threesome with Bermudez, the evidence is not probative of whether the complainant consented in the instant matter to engage in sexual relations with Gagne and Swathwood . . . . We conclude that the evidence was not relevant to the issue of consent, and that the trial court did not abuse its discretion in excluding the evidence.

Moreover, in light of the other evidence of the complainant's past sexual conduct that the trial court did admit, we reject defendants' argument that their rights of confrontation compelled the admission of this evidence and take note of the evidence that the trial court did admit. The jury heard about 'The Tony's Lounge Incident,' in which defendants, the complainant, and two other women engaged in group sex, according to defendants' version of the incident. Defendants further testified that the incident included the complainant performing oral sex on Swathwood. Even the complainant testified that after The Tony's

> Lounge Incident Gagne told her that she had engaged in oral sex with Swathwood, but she was unable to recall whether she had done so because she was intoxicated. Therefore, defendants presented evidence that the complainant was not averse to group sexual activity.

*Swathwood*, 2003 WL 1880143 at *2-3 (quotation marks and citations omitted).

The Michigan Court of Appeals therefore decided that neither the evidence of group sex with Bermudez nor the offer of group sex with Gagne's father was probative of P.C.'s consent on the night in question because the third participant was different (Swathwood rather than Bermudez or Gagne's father) and the surrounding circumstances were different (i.e., "the threesome involving Bermudez occurred while [P.C.] and Gagne were still dating[, whereas] [t]he instant offense occurred after they had ended their relationship"). Furthermore, the jury did hear evidence of P.C.'s participation in group sex with Gagne and Swathwood during the Tony's Lounge Incident.

The Michigan Court of Appeals accepted that the State has a legitimate interest under its Rape Shield Law in excluding evidence, and considered the probity of the evidence as a measure of Gagne's interest in admitting it. The United States Supreme Court has never held that rape-shield statutes do not represent a legitimate state interest, nor has it ever held that highly probative evidence will necessarily outweigh that interest. Quite to the contrary, the Court held in *Lucas*, 500 U.S. at 152-53, that the trial court must balance the state's interest against the defendant's interest on a case-by-case basis, and neither interest is superior *per se*. And the Court concluded in *Crane*, 476 U.S. at 690, that a trial court may even "exclude competent, reliable evidence . . . central to the defendant's claim of innocence," so long as there exists a "valid state justification." The Michigan Court of Appeals properly weighed the competing interests, as Supreme Court precedent requires, and did not misidentify or misapply any clearly established federal law.

## C.

Gagne argues here — as he argued to the Michigan Court of Appeals[20] — that evidence of group sex with Bermudez and the offer of group sex with Gagne's father was not merely competent, reliable, and central to his claim of innocence, but was the "most relevant piece of evidence":

> [T]he excluded evidence was the most relevant piece of evidence. It was critical for the defense to show that [P.C.] was willing to engage in sex with Mr. Gagne and another person at the same time. Without such a showing, the jury undoubtedly viewed Mr. Gagne's claim that [P.C.] voluntarily engaged in group sex with him with inherent disbelief. . . .

> The possibility that a woman would consent to have sex with two or more men at the same time strikes most people as bizarre, disgusting, and unlikely. In fact, a recent survey found that only 1% of women found group sex appealing. Thus, a jury may be inclined to view a consent defense with inherent disbelief. In this regard, evidence that the complainant previously consented to group sex with two or more men including one or more of the defendants does have legitimate probative value on the issue of consent, beyond the forbidden yes/yes inference. In any event, courts tend to admit such evidence.

> Because Lewis Gagne was not permitted to introduce the evidence of the prior instances of where [P.C.] engaged in or sought to engage in sex with him and another man, a critical question on the jury's mind — how would anyone consent to this kind of three-way group sexual activity, was left unanswered. Unanswered by evidence, the jury would be likely to conclude that she did not consent to such activity.

Appellee Br. at 16-17 (Sept. 20, 2010) (quotation and editorial marks, and citations omitted).

But this argument had been raised to the Michigan Supreme Court in no less than four cases, and had been rejected each time. An eight-year-old boy's prior acts of fellatio were inadmissible, even though it was critical for the defense to explain how the

---

[20]Recall that Gagne had argued to the Michigan Court of Appeals that "[t]he idea that a woman would have sex with two or more men at the same time strikes most people as bizarre and a jury, therefore, [would] be inclined to view a consent defense in a case like this one with inherent disbelief." *See* Section II.B, *supra*.

boy had such exacting knowledge of the act. *Arenda*, 330 N.W.2d at 815. A white man's prior solicitation of anal sex from black men was inadmissible, even though jurors would otherwise find such activities "aberrant" and consent unbelievable. *Hackett*, 365 N.W.2d at 122. Similarly, a woman's consensual sex with other men while she was married and pregnant was inadmissible even though, without such evidence, the jurors would find such activities "aberrant" and consent unbelievable. *Id.* A married couple's history of "digital-anal penetration" was inadmissible even though jurors would otherwise find it "abnormal" and assume that no woman would consent to such a "deviant" invasion of her body. *Adair*, 550 N.W.2d at 507. The Michigan Court of Appeals cited each of these cases and was not only aware of these holdings, but as an intermediate appellate court, was bound by them.

It might be that Gagne is correct that, as a matter of his defense, this was the "most relevant evidence" and the state courts were wrong to exclude it, but "whether the trial judge was right or wrong is not the pertinent question under AEDPA," *Renico*, 130 S. Ct. at 1865 n.3. The question is whether the last state court's decision was "objectively unreasonable," *Williams*, 529 U.S. at 409. One might disagree with the reasons given by the Michigan Court of Appeals — that the evidence was not sufficiently probative because the third participant(s) in and the surrounding circumstances of these other incidents were different, or that exclusion of the evidence was not particularly prejudicial because the jury heard about the Tony's Lounge Incident — but these are nonetheless legitimate reasons, and certainly not "so lacking in justification" as to be "beyond any possibility for fairminded disagreement," *see Harrington*, 131 S. Ct. at 787.

The "group sex" at issue in this case involved P.C.'s prolonged sex (oral, vaginal, and anal) in various positions with both men concurrently, spankings, and repeated vaginal and anal penetrations with multiple sex toys, vibrators and a wine bottle, resulting in vaginal and rectal bleeding and bruising. To be sure, jurors might find this behavior outlandish, aberrant, abnormal, bizarre, disgusting, or even deviant and, therefore, find it incredible or inherently unbelievable that P.C. would have consented

to it.  And it is not unreasonable to surmise that those jurors would be more likely to find consent if they were told that she had engaged in — and offered to engage in — group sex at least two other times in the past.  But, again, that is not the question.  The question is whether the Michigan Court of Appeals was "objectively unreasonable" in rejecting this argument. Considering the general antipathy for propensity evidence, the State's established interest in rape-shield laws, and the Michigan Supreme Court's repeated rejection of this argument, we cannot say that the decision in this case was "beyond any possibility for fairminded disagreement."

## IV.

Because Lewis Gagne cannot demonstrate that the decision of the Michigan Court of Appeals was objectively unreasonable, we **REVERSE** the district court and deny the petition.

———————————

**CONCURRENCE**

———————————

SUTTON, Circuit Judge, concurring.  I concur in full in the plurality opinion.

I write separately to say two things.  First, Judges Moore, Clay and Griffin offer three additional reasons for denying the writ, all of which make sense to me:  (1) Gagne's proffered evidence is not as probative as he submits once it is stripped of the forbidden inference that a woman who consents once to group sex is more likely to consent to it in the future; (2) the State's interests in its rape shield laws remain strong even after a trial court admits some evidence of the victim's past sexual practices; and (3) *Crane* and *Chambers* do not demand a contrary conclusion because the State's interest in its evidentiary rule was either nonexistent (*Crane*) or weak given the reliability and relevance of the evidence (*Chambers*).

Second, the combination of AEDPA and *Lucas* precludes me from joining Judge Kethledge's otherwise-forceful dissenting opinion.

―――――――――

**CONCURRENCE**

―――――――――

GRIFFIN, Circuit Judge, concurring.  I join Chief Judge Batchelder's opinion. I write separately to emphasize the dissent's unwise trumpeting of propensity evidence and its failure to appreciate the State's interest in excluding such evidence.

A defendant's Sixth Amendment right to present a "complete defense" is not unlimited.  Rather, the right "'may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process.'" *Michigan v. Lucas*, 500 U.S. 145, 149 (1991) (quoting *Rock v. Arkansas*, 483 U.S. 44, 55 (1987)).  In this case, it is undisputed that legitimate State interests support the enforcement of Michigan's Rape Shield Statute.  Indeed, the Supreme Court has noted that this very statute "represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."  *Id.* at 150.

In order to resolve Gagne's Sixth Amendment challenge, the Michigan courts were required to balance the State interest in enforcing its Rape Shield Statute against Gagne's interest in putting forth a complete defense.  *Id.* at 152-53.  Given the level of deference required by AEDPA, I agree with the majority that the Michigan courts were not unreasonable in performing this case-specific analysis.  The dissent, however, holds that the Michigan courts were unreasonable in weighing the competing interests at stake. In so doing, the dissent gives little credence to the State's interest in enforcing its Rape Shield Statute.  Indeed, the dissent maintains that this statute's "proscription does not even apply" in this case.  I respectfully disagree.

Michigan's Rape Shield Statute provides that

[e]vidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted . . . unless and only to the extent that the judge finds that the following proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value:

(a) Evidence of the victim's past sexual conduct with the actor.

(b) Evidence of specific instances of sexual activity showing the source or origin of semen, pregnancy, or disease.

Mich. Comp. Laws § 750.520j(1).   According to the dissent, because the excluded evidence in this case consisted of group sexual conduct involving both the victim and Gagne, the Rape Shield Statute does not apply.  This is incorrect.  Evidence of a victim's past sexual conduct with the defendant is admissible "*only to the extent* that the judge finds that the . . . proposed evidence is material to a fact at issue in the case and that its inflammatory or prejudicial nature does not outweigh its probative value." *Id.* (emphasis added).  In performing this assessment, the State's interests underlying the Rape Shield Statute must still be considered.  *People v. Adair*, 550 N.W.2d 505, 511 (Mich. 1996).

Contrary to the dissent's conclusion, evidence regarding consensual group sex does not fit into an exception to Michigan's Rape Shield Statute, a fact reasonably considered by the Michigan courts in weighing its probative value and prejudicial nature. *People v. Swathwood*, Nos. 235540, 235541, 2003 WL 1880143, at *2-3 (Mich. Ct. App. Apr. 15, 2003).  Indeed, evidence of the victim's past sexual conduct with others (in this case Bermudez and Gagne Senior) is generally considered irrelevant and highly prejudicial.  *Bell v. Harrison*, 670 F.2d 656, 658 (6th Cir. 1982) ("[E]vidence of a rape victim's prior sexual activity is of dubious probative value and relevance and is highly embarrassing and prejudicial."); *People v. Arenda*, 330 N.W.2d 814, 817 (Mich. 1982) ("The prohibitions contained in the rape-shield law represent a legislative determination that, in most cases, such evidence is irrelevant.").

Moreover, such propensity evidence is not generally admissible in either Federal or Michigan courts.  *See* Fed. R. Evid. 404(b) ("Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith[.]"); Mich. R. Evid. 404(b) (same). While it may be commonplace for one to assume that because a defendant robbed a bank before he likely committed a charged bank robbery, our well-established law does not permit such an inference

because it distracts from the issue of whether the crime alleged was committed by the defendant. *Old Chief v. United States*, 519 U.S. 172, 181 (1997). As the Supreme Court has explained, "[a]lthough . . . propensity evidence is relevant, the risk that a jury will convict for crimes other than those charged–or that, uncertain of guilt, it will convict anyway because a bad person deserves punishment–creates a prejudicial effect that outweighs ordinary relevance." *Id.* (internal quotation marks and citation omitted).

While propensity evidence is often admissible when it comes to a victim's past sexual conduct with the defendant to show consent, *Bell*, 670 F.2d at 658-59; *Adair*, 550 N.W.2d at 510; Fed. R. Evid. 412(b)(1)(B), in this case, the evidence at issue was not offered to demonstrate the victim's willingness to consent to sexual relations with Gagne. Indeed, the jury was well aware that the victim had a romantic, sexual relationship with defendant. Rather, the evidence was submitted to demonstrate the victim's general sexual proclivities to show conformity therewith. This is classic propensity evidence generally excluded by both the Rape Shield Statute and Rule 404(b) of both the Michigan and Federal Rules of Evidence. As the dissent acknowledges, the evidence was submitted to show that the victim was willing to engage in "facially coercive" sexual conduct, not that she was willing to engage in sexual relations with Gagne. Indeed, the logic espoused by the dissent opens the door to prior sexual conduct of the victim being admissible, as a constitutional requirement, whenever the sexual conduct at issue is outside the norm.

In my view, despite the victim's prior participation with Gagne in group sex, and prior willingness to participate in group sex with him, the State had an interest in preventing this propensity evidence from being submitted to the jury on the basis that it is highly prejudicial and irrelevant. *Bell*, 670 F.2d at 658; *Arenda*, 330 N.W.2d at 817.

In sum, the dissent claims that a fundamental, clearly-established constitutional error was committed by the State courts, not by the exclusion of any direct evidence of whether the alleged crime was committed, but by the exclusion of propensity evidence. The dissent embraces the inference that because the victim did it before, she likely did it again. Moreover, the dissent would not only allow the jury to consider such an

inference, but would hold that for purposes of habeas corpus review, the exclusion of such an inference was an unreasonable application of clearly established Federal law, as determined by the Supreme Court.  I respectfully disagree.  Given the State's interest in enforcing its Rape Shield Statute and the nature of the evidence at issue, the State was not unreasonable in weighing the interests at stake in favor of exclusion.

———————————————————————

**CONCURRING IN THE JUDGMENT ONLY**

———————————————————————

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment only. I agree that habeas relief is unwarranted under these circumstances. I do not agree, however, with the plurality's explanation of why the district court erred in granting habeas relief in this case.

Clearly established federal law requires that when excluding evidence offered by a criminal defendant, the trial court must balance the interests of the state in excluding the evidence with the infringement upon the weighty interests of the defendant in presenting a complete defense. "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (internal citations and quotation marks omitted). However, the exclusion of evidence pursuant to evidentiary rules "do[es] not abridge an accused's right to present a defense so long as [the rules] are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve'" and thus do not "infringe[] upon a weighty interest of the accused." *United States v. Scheffer*, 523 U.S. 303, 308 (1998) (quoting *Rock v. Arkansas*, 483 U.S. 44, 56 (1987)). Rape-shield statutes represent legitimate state interests and may, in some circumstances, preclude the admission of evidence relating to a prior sexual relationship between a victim and a defendant. *Michigan v. Lucas*, 500 U.S. 145, 152-53 (1991).

The plurality starts off on the right track, correctly explaining that a "trial court must balance a state's interest in excluding certain evidence under the rape shield statute against a defendant's constitutionally protected interest in admitting that evidence, on a case-by-case basis." Plur. Op. at 28. But the plurality then makes no effort to analyze whether the state court reasonably conducted that balancing in Gagne's case. Instead, the plurality concludes that because the Supreme Court has not explicitly held that

"highly probative evidence" could ever outweigh the state's interest in a rape-shield statute, the state court's identification of the state's interest in a rape-shield statute alone justifies the exclusion of all related evidence. *Id.* at 30. Even when that evidence is purportedly the "most relevant piece of evidence" to a defense, the plurality's approach would presumptively call a state-court decision excluding such evidence reasonable simply if the state court identified a rape-shield statute as the reason behind the exclusion. *Id.* at 31. This is not a correct basis for concluding that the Michigan Court of Appeals in this case—or in any case—did not unreasonably apply clearly established federal law.

The plurality's error flows in part from its misinterpretation of the principle that state courts are entitled to more leeway in the application of "general principles" than they are specific constitutional rules. Plur. Op. at 27.[1] The plurality implies that this leeway creates an insurmountable hurdle for defendants seeking habeas relief based on the unreasonable application of general principles. This is not so. The extent to which clearly established law "'requires a case-by-case examination of the evidence,' . . . obviates neither the clarity of the rule nor the extent to which the rule must be seen as 'established.'" *Williams v. Taylor*, 529 U.S. 362, 391 (2000); *see Lockyer v. Andrade*, 538 U.S. 63, 76 (2003) (reviewing on habeas the application of a "proportionality principle—the 'precise contours' of which 'are unclear'"). Clearly established law "encompasses more than just bright-line rules laid down by the Court," *Taylor v. Withrow*, 288 F.3d 846, 850 (6th Cir. 2002), and a lower court errs when it "unreasonably refuses to extend that principle to a new context where it should apply," *Williams*, 529 U.S. at 407.

Gagne is not entitled to habeas relief because the Michigan Court of Appeals did not unreasonably apply the clearly established constitutional principles discussed above to the excluded evidence in this case. An examination of the last reasoned state-court

---

[1]The plurality's error also rests on its excessive reliance on Michigan Supreme Court opinions. The plurality suggests, without support, that because the Michigan Supreme Court routinely excludes purportedly highly relevant evidence under the Michigan rape-shield statute, the Michigan Court of Appeals opinion could not have unreasonably excluded the proffered evidence in Gagne's case. Plur. Op. at 31-32.

decision reveals a not-unreasonable weighing of the probative value of the excluded evidence against the state's interest in its rape-shield statute, resulting in exclusion that was neither arbitrary nor disproportionate. *See People v. Swathwood*, Nos. 235540, 235541, 2003 WL 1880143, at *3 (Mich. Ct. App. Apr. 15, 2003) (unpublished opinion). In many ways, the dissent by Judge Kethledge has the better exposition of the general constitutional principles at issue in this case and how they should be considered on habeas. But the dissent, too, errs by grossly exaggerating the application of these principles to the facts of this case in assessing the reasonableness of the state court's application of these principles. I do not agree with the dissent that the evidence excluded from Gagne's trial was "indispensable." Dissent Op. at 64. Nor would I categorize the state's interest in this case as "minimal." *Id.* At a minimum, reasonable minds could readily differ on these issues, making habeas relief inappropriate.

The dissent of Judge Kethledge boldly claims that "[t]he only evidence with which Gagne could realistically defend himself . . . was the evidence that the trial court excluded." Dissent Op. at 62. I do not find the excluded evidence so compelling. The dissent relies heavily on the defense counsel's proffer that the Bermudez incident was "nearly identical" to the charged events to then conclude that the Bermudez incident was "nearly identical *brutal* sex." Dissent Op. at 61, 66 (emphasis added). This is a significant overstatement of the proffer. Defense counsel told the court that "the events alleged by [Bermudez] is nearly identical in most regards. There are some exceptions, but the general M.O., if you will, the way that event took place is almost identical to the way that the events charged in this case took place." R. 11-2 (1/2/01 State Hr'g Tr. at 19). At no point did defense counsel, either in his papers or at the hearing, characterize the Bermudez incident as "brutal" or "violent" in any way, and the defense certainly did not proffer that the Bermudez incident left the victim bleeding and with bruises all over

her body.**2** R. 11-2 (1/2/01 State Hr'g Tr. at 18-19); R. 23-4 (Def.'s Mot. and Offer of Proof at ¶ 4).

The dissent also suggests that the Bermudez incident and the alleged offer regarding Gagne's father were necessary to establish that the victim was willing to consent to simultaneous sex with more than one person. This is another overstatement. Although the admitted testimony regarding the Tony's Lounge incident did not involve *simultaneous* sex with two men, the incident involved allegations that the victim engaged in sexual acts in a group setting with both Gagne and Swathwood. To the extent that any prior sexual conduct by the victim could bear on her consent in the instant offense without resting purely on an inappropriate propensity argument, the Tony's Lounge incident arguably had greater probative value than either of the excluded encounters in that it involved group sexual activity with the two men she accused of rape. The excluded evidence was not so probative of consent in the instant offense as to render its exclusion a violation of Gagne's rights, particularly because the trial court did permit similar testimony relating to the victim's history. It was certainly not unreasonable for the state court to conclude as much.

On the other side of the balancing test, the state's interest in this case is particularly compelling. The state has a valid interest "in encouraging rape victims to come forward and in protecting victims from an embarrassing display of their past sexual history regardless of whether that history includes socially acceptable sexual practices." Resp. Supp. Br. at 11; *see also Lucas*, 500 U.S. at 149-50 ("The Michigan [rape-shield] statute represents a valid legislative determination that rape victims deserve heightened protection against surprise, harassment, and unnecessary invasions of privacy."). The state also has an interest in preventing irrelevant character evidence in the form of a victim's sexual history from misleading or prejudicing a jury when considering a

---

**2**Defense counsel also never proffered that the Bermudez incident involved the use of "a whip" and a "blue champagne bottle" as the dissent implies. Dissent Op. at 61. The proffer with respect to those items was that "it was common practice" for the victim and Gagne to use such items during their consensual sexual encounters. R. 23-4 (Def.'s Mot. and Offer of Proof at ¶ 4). The trial court specifically allowed the victim to be questioned regarding the use of such objects; the victim admitted to the consensual use of a whip but denied ever using a wine bottle.

victim's testimony relating to the charged events. I do not agree with the dissent's view that the state's interest in excluding evidence under a rape-shield statute in this case was "minimal." Dissent Op. at 64, 66. The state's interests are not eviscerated just because a trial court has admitted some evidence of a victim's past sexual practices, as the dissent seems to suggest. Dissent Op. at 63.

The dissent's efforts to analogize the enforcement of the state rape-shield statute in this case with the state rules arbitrarily enforced in *Chambers* and *Crane* inappropriately minimizes the state's interest in shielding rape victims and in preventing irrelevant character evidence from biasing a jury. In *Crane*, the state had not "advanced any rational justification for the wholesale exclusion" of evidence relating to the circumstances surrounding a confession when doing so undoubtedly infringed on weighty interests of the defendant. *Crane*, 476 U.S. at 691. In *Chambers*, the state had a discernible interest in the rule in question—hearsay generally may be excluded to insure fairness and reliability—but the Supreme Court held that "the hearsay rule may not be applied mechanistically to defeat the ends of justice," particularly when the excluded testimony had other indicia of reliability that would protect the state's interests in a fair proceeding. *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973). Neither case is truly comparable to the state's interest in excluding evidence in this case.

When a state court mechanistically applies a rape-shield statute to exclude indispensable evidence of a victim's sexual history, habeas relief may be warranted. That situation, however, is not before us today. The Michigan Court of Appeals properly stated the relevant constitutional principles and conducted a reasonable review of the trial court's evidentiary rulings in light of these constitutional principles. *Swathwood*, 2003 WL 1880143, at *1 (acknowledging need to balance interests protected by rape-shield statute with defendant's right to confrontation). The Michigan Court of Appeals considered the probative value of the excluded evidence and concluded that the trial court did not err in excluding some, but not all, of the victim's past sexual conduct. *Id.* at *3. The added probative value of the excluded evidence was indeed questionable, and the state court's application of the rape-shield statute was neither arbitrary nor

disproportionate to the state's interests in exclusion in this case. Even assuming that it was a close question whether the excluded evidence should have been admitted, the state court's decision upon balancing these interests was not unreasonable. I therefore concur in the judgment reversing the district court.

——————————————————————————

**CONCURRING IN THE JUDGMENT ONLY**

——————————————————————————

CLAY, Circuit Judge, concurring in the judgment only. While I agree with the plurality's decision to deny habeas relief, I write separately to clarify the limitations required under the Michigan rape shield law and to further respond to the dissent's argument in favor of admitting "pattern of conduct" evidence.

In its discussion of evidence indispensable to the defense, the dissent misapplies the facts and the application of law as to whether Clark's sexual history is admissible evidence as an exception under Michigan's rape shield law. According to Michigan evidentiary rules, "evidence of the victim's past sexual conduct with the actor" may only be admitted under Michigan's rape shield law if the "proposed evidence is material to a fact at issue in the case." Mich. Comp. Laws § 750.520j(1)(a). As a matter of legal interpretation, it is clear that this statutory provision outlines what evidence can be presented (past conduct between victim and actor) and for what purpose (as an offer of proof of a material fact at issue).

In this case, the fact at issue was one of consent. Therefore, under the rape shield statute, the trial court had the discretion to permit Gagne to present the Bermudez evidence if it was material to prior consent between Clark and himself. But there was no dispute at trial that Clark and Gagne had had prior consensual sexual encounters, even on the day in question. So it is clear that the *purpose* of the Bermudez evidence would not have been to demonstrate prior consent between Clark and Gagne, but prior consent between Clark and Bermudez. What is not clear is how evidence of consensual sex between Clark and Bermudez would be material to the material factual issue of whether Clark consented to sex with Gagne on July 3, 2000. Contrary to the dissent's position that the Bermudez incident was "critical" to Gagne's defense, the factual conclusion that the Bermudez evidence was indispensable to the central dispute in the case because of the lack of other evidence is unsupported by the record. The only bridge to finding evidence of consensual sex between Clark and Bermudez material to whether Clark had

consensual sex with Gagne on July 3, 2000 is to conclude that the kind of woman who would say "yes" to someone is the kind of woman who always says "yes." But this is the kind of assumption that the Michigan legislature attempted to circumvent by enacting its rape shield law, and to rule otherwise would undermine the obvious intent of the legislature. *See People v. Arenda*, 330 N.W. 2d 814, 816 (Mich. 1982) (stating that "[p]rimarily, [rape shield statutes] serve the substantial interests of the state in guarding the complainant's sexual privacy and protecting her from undue harassment."). It is clear that the purpose of the Michigan rape shield law is to protect witnesses, such as Clark, from the intrusive inquiries which could open the evidentiary door to allow a defendant to pry into a victim's sexual history. Such superfluous details of Clark's sexual activity with Bermudez would serve no purpose but to embarrass or humiliate Clark; and furthermore, they fail the materiality test, and should be excluded.

Regardless, whether the Michigan rape shield law actually required exclusion of the Bermudez evidence is a state law question not cognizable by this Court under habeas review. The issue of whether the trial court rightly excluded this evidence should not factor into this Court's determination. *See Logan v. Marshall*, 680 F.2d 1121, 1123 (6th Cir. 1982) (per curiam) (finding that it is not the court's responsibility to determine whether the exclusion of the evidence by the trial judge was correct or incorrect under state law, but rather whether such exclusion rendered petitioner's "trial so fundamentally unfair as to constitute a denial of federal constitutional rights") (citation omitted). Therefore, there is no evidence of clearly established federal law on the specific issue presented in this case, which is primarily one of state court application of state law. In addition, the evidence from the Bermudez incident was not sufficiently material to warrant an exception under the Michigan rape shield law.

Equally unpersuasive is the dissent's "fairness and common sense" standard that it utilizes to support the admissibility of "pattern of conduct" evidence. In this regard, the dissent would support the analysis of the district court. The opinion of the district court hinged on its conclusion that "[e]vidence of prior group sex involving Petitioner and Bermudez and evidence of the complainant's invitation to Petitioner's father was an

indication that it was not unusual or implausible for the complainant to engage in a 'threesome.'" *Gagne v. Booker*, 2007 WL 1975035, at * 8 (E.D. Mich. 2007). Simply speaking, the district court found that the evidence was critical to show Clark's propensity, or "pattern of conduct," for engaging in group sexual activity. *Id.*

The district court determined that the presentation of this kind of propensity evidence was pivotal to Gagne's defense because it helped establish a "pattern of conduct" which made the claim that Clark consented to the July 3, 2000 sexual encounter "more probable." *Id.* The district court therefore held "that Petitioner's right to a fair trial and his right to present a full and meaningful defense were violated by his inability to introduce additional facts about the complainant's conduct. The omitted evidence might have created a reasonable doubt that did not otherwise exist, and it might have altered the jury's impression of the complainant's credibility."[1] *Id.*

Gagne did not argue, nor did the district court find, that the purpose of introducing the Bermudez evidence went to Clark's "motive, bias or prejudice," but instead to her propensity. Nonetheless, the district court found that the Sixth Amendment *required* that Gagne be allowed to point to individual instances of Clark's past conduct to generally attack her credibility, even though this Circuit has previously held that the Constitution has no such requirement. *See Boggs v. Collins*, 226 F.3d 728, 739–41 (6th Cir. 2000) (concluding that an accuser's credibility "will almost always be the cornerstone of a rape or sexual assault case, even if there is physical evidence—the Constitution does not *require* that a defendant be given the opportunity to wage a general attack on [an accuser's] credibility by pointing to individual instances of past conduct. . . [and] simply does not reflect Sixth Amendment caselaw.").

As the plurality appropriately states, *Crane* represents the general principle that "the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense—such that the court may not 'exclude competent, reliable,

---

[1]Relevant to the issue of credibility is the fact that Clark never testified that she was averse to group sexual activities or that she had never participated in them. On the contrary, she testified that she may have engaged in exactly such activities with Gagne and Swathwood in the past. However, she testified that she did not consent on the evening of July 3, 2000.

evidence. . . central to the defendant's claim of innocence, . . . [i]n the absence of any valid state justification.'" Plur. Op. at 30. But the relevant holding of *Crane* was that "the blanket exclusion of the proffered testimony about the circumstances of petitioner's confession deprived him of a fair trial." *Crane v. Kentucky*, 476 U.S. 683, 690 (1986). The Supreme Court rationalized this holding by explaining as follows:

> That opportunity [to be heard] would be an empty one if the State were permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence. In the absence of any valid state justification, exclusion of this kind of exculpatory evidence deprives a defendant of the basic right to have the prosecutor's case encounter and survive the crucible of meaningful adversarial testing.

*Id.* at 690–91 (internal quotation marks and citation omitted). Mindful of this relevant holding, the Supreme Court's conclusion must be considered in light of the facts of that particular case. The Supreme Court's four-page decision in *Crane* concerned a Kentucky procedural rule that disallowed evidence of the "voluntariness" of a confession to be litigated at trial. Due to this rule, evidence of the highly coercive circumstances of a 16-year old boy's murder confession was not presented before a jury, where the prosecution "rested almost entirely" on the confession. *Id*. at 685.

Contrary to the dissent, a federal court sitting in habeas should not conclude that this analysis and holding "clearly establishes" that a defendant in a criminal sexual assault case has a constitutional right to present hearsay evidence[2] (that is, neither "competent" nor "reliable") bearing only on "predilections" (not credibility or "innocence") when such evidence is cumulative, perhaps irrelevant, and certainly not impeaching (instead of "central"). *See Bell v. Harrison*, 670 F.2d 656, 658 (6th Cir. 1982) (finding that evidence of a rape victim's past sexual behavior is neither a determinative or reliable indicator of the victim's consent to a specific act nor constitutionally required to be admitted); *see also Logan*, 680 F.2d at 1123. And furthermore, such a defendant's right to present this hearsay evidence bearing on

---

[2] There is no indication that Gagne was prepared to call Bermudez or his father to the stand, but instead it appears that Gagne would have introduced the Bermudez evidence only through his testimony.

predilections survives even when the state *does have* a "valid state justification" for its exclusion; and there is no "blanket exclusion" rule, but instead a discretionary, state law evidentiary rule, held to be constitutionally valid by the Supreme Court.  *See Michigan v. Lucas*, 500 U.S. 145 (1991).

I therefore concur in the judgment, only, to reverse the district court.

_____

## CONCURRING IN THE JUDGMENT ONLY
_____

HELENE N. WHITE, Circuit Judge, concurring in the judgment only.  I concur in the ultimate determination to reverse the district court's grant of habeas relief.

Unlike the plurality, I do not reject the dissent's legal analysis and find its application of clearly established law sound based on the record as it interprets it.  If the record is not so interpreted, however, the excluded evidence ceases to have the crucial significance necessary to support the conclusion that Gagne was denied his constitutional rights to confront witnesses against him and present a defense.  Although I find the dissent's interpretation of the record reasonable, I do not think it is compelled.  Because I conclude that the record is also reasonably susceptible of the interpretation espoused by Judge Moore, Op. Concurring in Judgment at 3-4, and believe that we must read it in that manner under AEDPA, I concur in the judgment of reversal.

—————————

## DISSENT

—————————

MARTIN, Circuit Judge, dissenting. I join Judge Kethledge in his dissent. I write separately only to express my personal views on this case. I disagree with the majority's characterization of this case as one about the application of Michigan's rape-shield statute. I believe this case is instead about the standards for admission of evidence.

The Michigan rape-shield statute is an important mechanism by which Michigan protects victims of sexual assault. The question before us today, however, is not whether the statute presents a legitimate state interest, which I believe it does. Michigan's interest in protecting victims of sexual assault is not at issue here. The issue is instead purely evidentiary: whether an individual has met his evidentiary burden.

In a rape case, adult individuals should be allowed to introduce evidence of past relevant behavior going towards whether the sexual act in question was consensual. The language of Michigan's rape-shield statute does not bar the admission of Lewis Gagne's proposed evidence of past similar consensual conduct involving himself, P.C.,[1] and a third individual, and an offer by P.C. to engage in an additional instance of such conduct. I believe the probative value of this evidence outweighed the prejudice, and the exclusion of this evidence violated Gagne's constitutional rights. I am disappointed in the majority's decision to frame this evidentiary issue as a protection of Michigan's rape-shield statute.

---

[1]At the request of Judge Griffin, the complainant's initials have been used in lieu of her full name.

_____

**DISSENT**

_____

KETHLEDGE, Circuit Judge, dissenting.  Even the State admitted, in oral argument for this case, that the sexual conduct at issue here—rough, three-way sex involving the complainant, the defendant, and another man—would appear "facially coercive" to a jury.  The charged conduct would appear that way, that is, *unless* the jury was told that the complainant had consented to virtually identical conduct with Gagne and another man just four weeks earlier, and had proposed the same thing to Gagne and another man on a third occasion.  Viewed in that context, conduct that at first seemed facially coercive to the jury might not have seemed coercive at all, at least not on its face.  That is a critical difference in a rape trial in which the only issue was consent and the stakes ran as high as 45 years in prison.  Yet the state courts barred Gagne from presenting evidence of these incidents on relevance grounds.

The logic of the State's concession is that, as a practical matter, the burden was on Gagne at trial to prove that the charged conduct was consensual.  And so the question presented by Gagne's case is a narrow one:  whether, in a trial where the charged conduct is facially coercive and the only issue is consent, evidence that the complainant had consented to the same kind of conduct with the defendant, only a handful of weeks before, is indispensable to his defense.  Under the Supreme Court's caselaw—and by any measure of fairness and common sense—the clear answer to that question is yes.

I.

At the outset, it is important to make clear what this case is not about.  The State and its amici argued in seeking rehearing, and continue to argue before the court *en banc*, that a decision to affirm the district court's issuance of the writ in this case would "effectively abrogate every rape-shield law in this circuit."  Seldom in legal analysis is an assertion so demonstrably false.

Begin with the fact that the State does not even venture to assert that Michigan's rape-shield statute (or any other) actually bars admission of the evidence at issue here. There is a reason for that omission. The core of any rape-shield law is its proscription against evidence of past sexual activity by the victim. But every one of those laws contains an exception for evidence of the victim's prior sexual activity *with the defendant*. And that is precisely the kind of evidence at issue here. Michigan's statute excepts from its proscription "[e]vidence of the victim's past sexual conduct with the actor." Mich. Comp. Laws § 750.520j(1)(a). Ohio's statute does the same. *See* Ohio Rev. Code § 2907.02(D) (excepting evidence of "the victim's past sexual activity with the offender"). So does the Tennessee rule. *See* Tenn. R. Evid. 412(c)(3) (allowing admission of evidence if "sexual behavior was with the accused, on the issue of consent"). The Kentucky rule affirmatively provides that "evidence of specific instances of sexual behavior" between the alleged victim and defendant "*is* admissible" if offered to prove consent and otherwise admissible under the rules. *See* Ky. R. Evid. 412(b)(1)(B) (emphasis added). The federal rule does the same. *See* Fed. R. Evid. 412(b)(1)(B).

And thus the State's rhetoric runs into a reality of judging: it is hard to invalidate a provision that does not even apply to the case at hand. It is harder still to invalidate provisions that actually support the result reached in the case. Here, none of the rape-shield statutes in our circuit would bar admission of the evidence at issue, and the federal and Kentucky rules would affirmatively allow its admission. The State does not even dispute the point. The conclusion that affirmance of the district court's judgment would not "invalidate" these statutes follows almost by mathematical proof.

The various arguments offered in support of the State's position on rehearing, in contrast, do not offer anything at all like mathematical proofs. What they offer is scarecrow rhetoric. We are told, for example, that affirmance of the district court's judgment would deal the statutes a "serious blow," and indeed would "call into question the ordinary application of the rape-shield statute"—this, in a case where the statute's bar would not apply in the first place. The arguments' driving impulse, it seems, is that

we ought to have a penumbra of inadmissibility around the zone of inadmissibility that the rape-shield statutes actually prescribe—lest anyone ever infer that we undermine those statutes in vindicating a defendant's constitutional rights. The arguments' premise, fundamentally, is that certain statutory values are so important as to trump constitutional ones. The premise is viable only to the extent it remains unstated. There is no rape-defendant exception to the Constitution.

But the conflict the State posits is a false one. The dynamic between a defendant's constitutional rights and the interests served by the rape-shield laws is not a zero-sum game. The laws themselves strike a balance between the important interests they serve, on the one hand, and evidence critical to the defense, on the other. And thus our concern for a defendant's constitutional rights does not amount to a lack of concern for the interests served by the rape-shield laws. We honor these laws when we respect the balance they strike. It is the State's position, and not ours, that imperils these laws, by giving them a scope beyond their terms, and thus bringing them into conflict, needlessly, with constitutional values.

Equally misdirected is the claim that a decision to affirm the district court would trample upon the policies that animate these laws. The argument is that, in deeming the evidence here indispensable, the district court indulged in forbidden inferences whose eradication was a principal aim of these laws. But again the argument is let down by the laws. Everyone agrees that these laws are supported by important state interests. (The extent to which those interests are implicated in a particular case, as discussed below, is another matter.) And yet, notwithstanding those important interests, every one of these laws contains an exception for evidence of consensual sex with the defendant. These laws must infer something very important about such evidence; and they do so especially in cases—like this one—where consent itself is the issue. The rape-shield laws are more nuanced than the State gives them credit for. The laws' own inference is that, in some cases, evidence of past consensual sex with the defendant is highly relevant to the issue of consent in the incident giving rise to the charge. Here, the district court

merely concluded that this was such a case.  In doing so, the district court did not abrogate the policies reflected in these laws; it applied them.

## II.

The State otherwise argues that the Michigan Court of Appeals's decision in this case falls within the latitude afforded a state court under AEDPA.  As relevant here, the statute limits habeas relief to cases where the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[.]"  28 U.S.C. § 2254(d).  I am well-aware that this standard is difficult to meet.  But it is not impossible to meet; and it is met here.

## A.

During his rape trial, Gagne sought to admit evidence that, "within 30 days of the charged offense," the complainant had engaged in three-way sex with Gagne and another man, Ruben Bermudez, and that "the way that event took place is almost identical to the way that the events charged in this case took place."  1/2/01 Hearing Tr. at 18-19.  Gagne's counsel stated that both Bermudez and Gagne himself would testify to that effect.  Gagne also sought to admit evidence that, within approximately two months of the charged conduct, the complainant had proposed the same kind of conduct to Gagne and his father.  The trial court excluded all this evidence on grounds that it was more prejudicial than probative.

In his direct appeal, Gagne claimed that the exclusion of this evidence violated his procedural due-process right to present a complete defense and his Sixth Amendment right to confront the witnesses against him.  The Michigan Court of Appeals held that these claims were meritless.  The decisions of the Supreme Court of the United States show otherwise.

B.

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). At the same time, trial judges must make "dozens, sometimes hundreds" of evidentiary decisions throughout the course of a typical case; and "the Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane*, 476 U.S. at 689-90 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)) (alterations and omissions in original). The point of cases like *Crane*, however, is not that this latitude exists. The point is that the Constitution places limits upon it.

1.

One case that marks out those limits is *Chambers v. Mississippi*, 410 U.S. 284 (1973). There, Leon Chambers had been charged in state court with the fatal shooting of a police officer, Aaron Liberty. After Chambers had been charged, another man, Gable McDonald, gave a sworn confession that he had shot the officer. But McDonald repudiated his confession a month later, claiming that he had only made the confession as part of a deal to share the proceeds of a lawsuit that Chambers allegedly planned to bring as a result of Chambers's own injuries in the melee in which the officer was killed. The State proceeded with Chambers's prosecution. His defense was that McDonald shot Officer Liberty. At trial, the court allowed Chambers to admit some evidence in support of that defense, including McDonald's written confession, a witness's testimony that he saw McDonald shoot the officer, another witness's testimony that he saw McDonald with a gun after the shooting, and the testimony of a third witness who contradicted McDonald's alibi. But the trial court excluded testimony from three witnesses to the effect that, in separate conversations with each of them, McDonald had confessed to the

killing.  The court also refused to allow Chambers to cross-examine McDonald as an adverse witness.  The jury eventually convicted Chambers of murdering Officer Liberty.

Chambers argued in the Supreme Court that the trial court's evidentiary decisions had violated his procedural due-process right "to a fair opportunity to defend against the State's accusations." *Id.* at 294.  The State there appeared to respond much as the State does here:  trial courts have wide latitude to exclude evidence at trial; the court's decisions were based upon state evidentiary rules that serve important interests; and, given the evidence that the trial court did admit, its decisions adverse to Chambers did not render his trial fundamentally unfair.

The Supreme Court rejected the State's arguments.  The Court said that "[t]he rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." *Id*.  The Court described these two rights—confrontation and calling witnesses—in similar terms.  Although the right to confront and cross-examine is "essential and fundamental" to a fair trial, the Court said, the right "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." *Id.* at 295.  But the right's "denial or significant diminution calls into question the ultimate integrity of the fact-finding process and requires that the competing interest be closely examined." *Id.* (internal punctuation omitted).  Similarly, the Court said that "[f]ew rights are more fundamental than that of an accused to present witnesses in his own defense." *Id.* at 302.  And so the Court took a close look at the competing interests with respect to that right as well.  *Id.*

In gauging these interests, the Court delivered a notably realistic assessment of how Chambers's ability to defend himself was affected by the trial court's decisions in his case.  The Court observed that the trial boiled down to a credibility contest between Chambers and McDonald, since, "in the circumstances of this case, McDonald's retraction [of his confession] inculpated Chambers to the same extent that it exculpated McDonald." *Id.* at 297.  And in that contest Chambers was significantly, though by no means totally, disabled.  His "predicament" as a result of the trial court's rulings, the Court said, was that "he was unable either to cross-examine McDonald or to present

witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity." *Id*. at 294.  It was true, the Court said, that the evidence admitted at trial—McDonald's written confession, testimony from one witness contradicting McDonald's alibi, testimony from another who said he had seen McDonald shoot the officer first-hand—had "chipped away" at McDonald's credibility. *Id.*  Thus the State argued in effect—just as the amici States argue here—that the trial court had split the difference, and that the Court ought to leave things where they were.  But the Supreme Court chose not to decide the case upon a mere recitation of platitudes.  It instead took a careful look at all of the evidence, admitted and excluded alike, and analyzed impartially the effect of the trial court's decisions upon the dynamic at trial.  Its conclusion was based upon common sense:  "Chambers' defense was far less persuasive than it might have been had he been given an opportunity to subject McDonald's statements to cross-examination or had the other confessions been admitted." *Id.*

Against these interests, the Court weighed the State's interests in support of the trial court's decisions.  The trial court had excluded McDonald's confessions to the three witnesses on hearsay grounds.  As a generic matter, the Court recognized, the interests supporting that rule are significant:  "perhaps no rule of evidence has been more respected or more frequently applied in jury trials than that applicable to the exclusion of hearsay[.]" *Id*. at 302.  But the court did not weigh those interests generically; it weighed them "under the facts and circumstances of this case[.]" *Id.* at 303.  And having done so, the Court determined that the interests supporting exclusion of the three confessions were slight, primarily because the confessions themselves were trustworthy—again in light of the particular facts and circumstances of Chambers's case. *Id.* at 302.

The Court likewise made short work of the trial court's decision to bar Chambers from examining McDonald as an adverse witness, which had been based on Mississippi's "voucher rule." *Id.* at 295-96.  Again looking at the specific facts of his case, the Court said that "McDonald's testimony was in fact seriously adverse to

Chambers[,]" regardless of who put McDonald on the stand. *Id.* at 297. Thus, the Court held, "[t]he 'voucher' rule, as applied in this case, plainly interfered with Chambers' right to defend against the State's charges." *Id.* at 298. The Court concluded: "the exclusion of this critical evidence, coupled with the State's refusal to permit Chambers to cross-examine McDonald, denied him a trial in accord with traditional and fundamental standards of due process." *Id.* at 302.

a.

The parallels here are not hard to discern. This case too boiled down to a credibility contest between the defendant and another witness. In this case too the defendant was allowed to admit some of the evidence he proffered at trial—specifically, testimony concerning the so-called "Tony's Lounge" incident, which was a five-way orgy in which the complainant consensually participated, and which the State and the Michigan Court of Appeals said was an adequate substitute for the three-way evidence that the trial court excluded. (To be clear, however, the record indicates that this incident was actually a room full of two-way sex, during which the complainant engaged in sex with Gagne and Swathwood sequentially rather than at the same time, *see* Joint App'x at 43-46; and, as shown below, the State itself characterized the incident as sequential two-way sex in its closing argument to the jury.) The issue here, then, is no different from the issue in *Chambers*: Whether the excluded evidence lost its "critical" nature in light of the evidence that the trial court did admit. That, I suggest, is the nub of this appeal.

The issue, in terms specific to this case, is whether the admission of the Tony's Lounge evidence rendered the prior three-way incidents merely "cumulative[,]" as the State now argues, rather than critical. But on this issue the State has virtually made Gagne's case for him. To do more than "chip[] away" at the State's case against him, *Chambers*, 410 U.S. at 294, Gagne had to do more than demonstrate the complainant's willingness to engage in sequential sex with Gagne and another man. Instead, he had to demonstrate the complainant's willingness specifically to engage in the kind of *facially coercive three-way sex* (with Gagne) involved in the charged incident. This distinction

has been the prosecution's battering ram throughout this litigation.   Consider, for example, how in closing argument the prosecution itself distinguished the Tony's Lounge incident from the charged conduct in this case:

> That situation [the Tony's Lounge incident] did not involve, ladies and gentlemen, *two men.*  That situation did not involve penetration of her anus multiple times, her vagina, multiple times, and oral sex multiple times. *It did not involve physical abuse*, which is what is charged here, and what the physical and testimonial evidence show occurred.

2/5/01 Trial Tr. at 12-13 (emphasis added).

To which I would say:  Precisely.  The Tony's Lounge evidence was not a fair substitute for the excluded evidence precisely because of the very distinctions called out by the prosecution in seeking (and obtaining) a conviction in this case.  That the complainant would engage in comparatively benign sequential sex in the Tony's Lounge incident does not come close to refuting the prosecution's argument that she would *not* consent to what the State itself calls the "brutal" three-way sex at issue here.  State's Supp. Br. at 12.  To offer some bland assurance to the contrary is to ignore reality, and to apply the Constitution's principles to a fairyland trial rather than the trial that actually occurred.

The State makes this point even more emphatically in its supplemental brief to this court—albeit inadvertently.  The State argues:

> [T]he dissimilarity between the charged act and the prior excluded acts cannot be emphasized enough *because of the violent nature of the rape.* . . . [T]here is no evidence that the alleged threesome with Bermudez involved the type of sexual activity or the type of brutality that the charged incident involved.  There was no offer of proof that [the complainant] engaged in anal sex, *that she allowed a bottle to be inserted in her rectum and vagina, that she allowed a whip to be used*, or that she allowed or enjoyed being hit in the buttocks.  There is nothing in the excluded evidence that indicates she would consent to the brutal sex that took place on the night of the charged incident.  Thus, it is only minimally relevant.

State's Supp. Br. at 12 (emphasis added). The major premise of the State's argument here, as with its closing argument at trial, is that the complainant's participation in *non-brutal* sex—such as the Tony's Lounge incident—is "only minimally relevant" to whether she would have consented to "the brutal sex that took place on the night of the charged incident." (More on that below.) The argument's minor premise is that the Gagne-Bermudez incident was not brutal in the ways that the charged incident was. Thus, the State concludes, the Gagne-Bermudez incident was "only minimally relevant."

The problem with the State's syllogism is that it has its facts wrong. Gagne's counsel stated that Gagne and Bermudez were each ready to testify that their three-way sex with the complainant—less than 30 days before the charged incident—was "*almost identical to the way that the events charged in this case took place*." *See* 1/2/01 Hearing Tr. at 18-19 (emphasis added); *see also id.* at 19 (noting that the prior incident was "*nearly identical in most regards*") (emphasis added).[1] Non-brutal three-way sex is not "almost identical" or "nearly identical" to brutal three-way sex. And thus it is simply not an accurate reading of the record to say that the Bermudez incident, as described in the proffer, was less brutal than the charged incident.

Moreover, Gagne's counsel stated in a Motion for Reconsideration that, when the excluded testimony is considered "*in conjunction*" with the evidence that the court did admit (including testimony relating to the use of sex objects, such as the whip and blue champagne bottle), the Bermudez incident "establish[es] as clear a pattern as can be imagined *which is similar to what is alleged here as non-consensual conduct*." R. 23-4 at 20 (emphasis added). The trial court did admit testimony that the complainant had used the whip and bottle during sex generally; but the true power of that testimony comes from its combination (or "conjunction") with the excluded testimony regarding the Bermudez incident—which then could have been shown to have been "almost

---

[1] At the prosecution's request, the parties stipulated to paraphrase these points during the hearing, because otherwise, the prosecution said, it would move to clear the courtroom. *See id.* at 16-17. We therefore should not hold against Gagne the fact that his lawyer did not enumerate the rough details that the State enumerated in the passage excerpted above from its brief.

identical to the events charged in this case." The State simply overlooks these aspects of the record in its brief.

And so the State should reap the whirlwind here. It is undisputed that evidence of the complainant's consent to non-brutal sex was only minimally relevant to Gagne's ability to defend himself at trial. The Tony's Lounge evidence was precisely that. Per the State's own arguments, that evidence was no substitute for the evidence that the trial court excluded in this case.

It follows that the excluded evidence was "critical" to Gagne's defense. *Chambers*, 410 U.S. at 302. What Gagne faced was a theory of *res ipsa loquitur* as applied to a rape case: the brutal and facially coercive nature of the charged conduct spoke for itself at trial, to the effect that the conduct was not consensual. That undisputed fact severely disadvantaged Gagne in the credibility contest upon which his trial turned. His only chance of defending himself was to admit evidence that the complainant had consented to in one instance, and proposed in another, almost identical conduct with Gagne and another man—and moreover that the complainant had done so just weeks before the charged conduct here. Absent this evidence, Gagne's "defense was far less persuasive than it might have been had he been given an opportunity" to admit this evidence and then cross-examine the complainant on the basis of it. *Id.* at 294. That parallel with *Chambers*, I think, cannot be seriously disputed. Indeed I think that Leon Chambers was better off in his trial than Gagne was in his—since in Chambers's credibility contest he at least had McDonald's written confession and a witness's first-hand testimony that McDonald had done the shooting. Gagne, by comparison, had next to nothing at all.

The only evidence with which Gagne could realistically defend himself—evidence, I might add, that suggests a substantial possibility that he is innocent—was the evidence that the trial court excluded. Even when viewed deferentially, the court's decision to strip that evidence out of the case "plainly interfered with [Gagne's] right to defend against the State's charges." *Id.* at 298. What was left

was an empty husk of a trial—at whose conclusion came a prison sentence of up to 45 years.

b.

*Chambers* instructs that we must look at not only the interests supporting admission of Gagne's evidence, but also the interests supporting its exclusion. I begin with the rationale offered by the Michigan Court of Appeals for the exclusion of Gagne's evidence. That court did not even discuss federal constitutional law in rejecting Gagne's claim that the exclusion of the subject evidence violated his due-process right to present a complete defense. What the court did say was that "the complainant's willing participation" in the Gagne-Bermudez three-way was "not probative" of whether she willingly participated in the Gagne-Swathwood three-way (the charged conduct) four weeks later, because "the threesome involving Bermudez occurred while the complainant and Gagne were still dating." Mich. Ct. App. Op. at 3. (Apparently they broke up a week or two later.) The court also noted that the third participant in the charged conduct was "Swathwood, not Bermudez." *Id.* The court held that evidence of the complainant's proposed three-way with Gagne and his father was "not relevant" for essentially the same reasons.

As an initial matter, none of this reasoning makes much sense even on its own terms. That the complainant and Gagne were "dating" at the time of the Gagne-Bermudez incident and the Gagne-Gagne, Sr., proposal is not a serious reason to distinguish those events, for purposes of the complainant's consent, from the Gagne-Swathwood incident four weeks later. The court of appeals's assumption, apparently, was that the complainant and Gagne were less likely to engage in consensual sex once their relationship had ended. Generically, that assumption might make sense. On this record, it does not—because the assumption is affirmatively refuted by the undisputed fact that the charged incident began with consensual oral sex between the complainant and Gagne.

Nor is there any basis to distinguish the excluded incidents from the charged one on the ground that the excluded incidents involved Bermudez and Gagne, Sr.,

respectively, whereas the charged one involved Swathwood. Here the court's assumption, apparently, was that the complainant was for some reason more willing to consent to group sex with Bermudez or Gagne, Sr., as the third participant, than she was with Swathwood. The court cited no basis for that assumption. And again the record refutes it, since the complainant undisputedly engaged in consensual sex *with Swathwood* during the Tony's Lounge incident. Thus, even when viewed deferentially, none of this reasoning describes an interest remotely as significant as Gagne's interest in defending himself at trial.

But the State suggests that other interests lurk in this appeal. The interests are those advanced by Michigan's rape-shield law. As a generic matter, I entirely agree that Michigan's rape-shield law (like the hearsay rule in *Chambers*) protects important state interests in the vast majority of cases in which it is implicated. We cast no aspersion upon that law when we say that a defendant was denied a fair trial in a case in which the law's proscription does not even apply. But more to the point: *Chambers* makes clear, as discussed above, that the interests supporting exclusion of Gagne's evidence must be assessed not generically, but rather in light of "the circumstances of this case." 410 U.S. at 297.

In this trial, I respectfully submit, there was virtually nothing left for the rape-shield statute to protect. As an initial matter, this case only weakly implicates the interests protected by the statute, since the statute's terms did not even bar the excluded testimony, but instead left its admission to the discretion of the Ingham County Circuit Judge. *See* Mich. Comp. Laws § 750.520j(1)(a). And it is hard to see what was left of those interests, such as they were in this case, given the evidence of sexual activity (albeit non-brutal) and drug use that *was* admitted at trial. The only sense in which Gagne's evidence was "cumulative," I submit, was as to whether its admission in this trial would have diminished those interests any further.

And so we must decide whether the court of appeals's decision in this case reflects an unreasonable application of *Chambers*. For all the reasons described above—the palpably indispensable nature of this evidence to Gagne's defense, the

minimal interests supporting its exclusion in the circumstances of this case, and the State's own arguments as to why the Tony's Lounge evidence was no substitute—I do not think that "fairminded jurists" could conclude that the state court's decision here was consistent with *Chambers*. *See generally Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Indeed I submit that the state court's decision was worse than an unreasonable application; it was arguably "contrary to" *Chambers*. *See* 28 U.S.C. § 2254(d)(1). A state court's decision is contrary to Supreme Court precedent if the state court "'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a'" different result. *Price v. Vincent*, 538 U.S. 634, 640 (2003) (citation omitted). Aside from the nature of the offenses, this case is indistinguishable from *Chambers*: Both state courts relied on flimsy evidentiary rationales to exclude evidence that was critical to resolving a credibility dispute, all on the mistaken theory that the defendant was allowed to introduce some similar evidence in his defense.

Even genuine deference has its limits. They were passed here. *Chambers* requires issuance of the writ in this case.

2.

The Supreme Court's decision in *Crane v. Kentucky*, 476 U.S. 683 (1986), confirms that conclusion. Like *Chambers*, *Crane* requires consideration of two factors in determining whether the exclusion of evidence denies a defendant the right to present a complete defense. The first is the extent to which the evidence was "central to the defendant's claim of innocence." *Id*. at 690. The second is the extent to which its exclusion was supported by a "valid state justification[.]" *Id.*

In *Crane*, the defendant was convicted of murder. He was 16 years old at the time of the crime. There was "no physical evidence to link him" to the murder. *Id.* at 691. The State's evidence of guilt was primarily Crane's own confession. Crane sought to discredit the confession with testimony that "he had been detained in a windowless room for a protracted period of time, that he had been surrounded by as many as six police officers during the interrogation, that he had repeatedly requested and been denied

permission to telephone his mother, and that he had been badgered into making a false confession." *Id.* at 685. That evidence, the Supreme Court said, was "highly relevant" to the reliability and credibility of the confession, which again was the State's primary evidence of guilt. *Id.* at 691. And the Court saw no justification for excluding the evidence under the circumstances presented there. The Court held, unanimously, that the exclusion of Crane's testimony violated his right to present a complete defense.

The analysis flows in the same channels here. In both *Crane* and this case, the excluded evidence was "central to the defendant's claim of innocence." *Id.* at 690. The excluded evidence was central in each case because the cases themselves were alike in a critical respect: given the *res ipsa* nature of the prosecution's evidence—a confession there, the facially coercive nature of the charged conduct here—the burden was on the defendant, as a practical matter, to demonstrate his innocence at trial. The Supreme Court described Crane's predicament as follows: "[S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered: If the defendant is innocent, why did he previously admit his guilt?" *Id.* at 689. The dynamics of Gagne's trial were no different: stripped of the ability to introduce evidence that the complainant had consented to brutal three-way sex in the recent past, Gagne was effectively disabled from demonstrating to the jury that she had consented to nearly identical brutal sex in the charged incident.

In both this case and *Crane*, the excluded evidence was indispensable to the defendant's ability to demonstrate his innocence. And in each case the State's interests in excluding the evidence were minimal. Thus, for essentially the same reasons already discussed with respect to *Chambers*, *Crane* supports issuance of the writ in this case.

3.

The Supreme Court's decision in *Olden v. Kentucky*, 488 U.S. 227 (1988) (per curiam), is significant for purposes of Gagne's claim under the Confrontation Clause. Like this case, *Olden* was a rape case. There, the complainant had been drinking at a local bar with James Olden and his co-defendant, Charlie Ray Harris. The three of them

left the bar in Harris's car. The complainant later told police that Harris had stopped the car at some location and held her down as Olden raped her at knife-point. She said that Harris and Olden then drove her to a dump, where two other men joined them and Olden raped her again. Finally, Harris dropped off the complainant near the home of Bill Russell, with whom she was then having an extramarital affair. Russell emerged from his home as the complainant stepped out of Harris's car. She immediately told him that she had been raped by Olden and Harris.

At trial, Olden and Harris "asserted a defense of consent." *Id*. at 229. Specifically, they claimed that the complainant had engaged in consensual sex with them and then "concocted the rape story to protect her relationship with Russell, who would have grown suspicious upon seeing her disembark from Harris' car" in the early-morning hours. *Id.* at 230. At trial, two other men testified that they had joined the group after the alleged rape occurred, and that the complainant "did not appear upset." *Id.* at 229. One of those witnesses also testified that the complainant had approached him at the bar that evening and said "that she was looking for a black man with whom to have sex." *Id*. (The defendants in *Olden* were black.) A third "independent witness" also testified that "he had seen [the complainant], Harris, and [Olden] at a store called Big O's on the evening in question, that a policeman was in the store at the time," and that the complainant had "made no attempt to signal for assistance." *Id*. When the complainant herself testified at trial, Olden's counsel cross-examined her concerning "a number of inconsistencies in [her] various accounts of the alleged crime." *Id*. at 228. Specifically, the complainant "originally told the police that she had been raped by four men." *Id.* Later, she claimed that only Olden and Harris had raped her; and at trial, "she contended that [Olden] was the sole rapist." *Id.* In addition, "while [the complainant] testified at trial that [Olden] had threatened her with a knife, she had not previously alleged that [he] had been armed." *Id.*

But the trial court barred Olden from cross-examining the complainant with one piece of evidence in particular: the fact that she was living with Russell at the time of trial. Olden contended at trial that evidence of their cohabitation was "crucial" to

Olden's efforts to demonstrate the complainant's "motive to lie[.]"  *Id*. at 230.  But the trial court "granted the prosecutor's motion *in limine* to keep all evidence of [the complainant's] and Russell's living arrangement from the jury."  *Id.*  Olden was thereafter convicted of forcible sodomy and sentenced to 10 years in prison.

The Kentucky Court of Appeals affirmed, holding that the cohabitation evidence was properly excluded.  Its reasoning marked the path of the trial court's reasoning in excluding Gagne's evidence here.  Specifically, the Kentucky court held that the cohabitation evidence "was not barred by the State's rape shield law[,]" but that "its probative value was outweighed by its possibility for prejudice."  *Id*. (internal punctuation and alterations omitted).  The court went on to say that the cohabitation evidence could "have created extreme prejudice against [the complainant]" with the jury, because she "was white and Russell was black."  *Id*. at 231 (internal punctuation omitted).

The Supreme Court summarily reversed, holding that "[t]he Kentucky Court of Appeals failed to accord proper weight to [Olden's] Sixth Amendment right to be confronted with the witnesses against him."  *Id*. (internal punctuation omitted).  "That right," the Court made clear, "includes the right to conduct reasonable cross-examination." *Id*.  The right was violated in Olden's case, the Court reasoned, because "'[i]t is plain to us that 'a reasonable jury might have received a significantly different impression of the witness' credibility had defense counsel been permitted to pursue his proposed line of cross-examination.'"  *Id*. at 232 (quoting *Van Arsdall*, 475 U.S. at 680) (internal alterations omitted).

Again the parallels here are not hard to discern.  In both cases the charge was rape.  Both cases boiled down to a credibility contest in which the sole issue was consent.  In both cases the complainant's "testimony was central, indeed crucial, to the prosecution's case."  *Id.* at 233.  In both cases the defendant sought to impeach the complainant's testimony with evidence that the state courts chose to exclude.  In both cases the state courts held that the evidence was not barred by the State's rape-shield

law, but that it was more prejudicial than probative. And in both cases the defendant was permitted to cross-examine the complainant based upon other evidence in the case.

Thus, in this case, the Michigan Court of Appeals confronted a "'set of facts that are materially indistinguishable from'" a decision of the Supreme Court, namely *Olden*. *Price*, 538 U.S. at 640 (citation omitted). Yet the Michigan Court of Appeals "'arrive[d] at a [different] result,'" *id.*, than the Supreme Court did. In doing so, the Michigan court reasoned that, "in light of the other evidence of the complainant's past sexual conduct that the trial court did admit, we reject defendants' argument that their rights of confrontation compelled the admission of this evidence[.]" Mich. Ct. App. Op. at 4. The court then went on to say that the jury had "heard about" the Tony's Lounge incident and that the subject incident began with consensual oral sex between the complainant and Gagne.

The "other evidence" cited by the Michigan court does not even begin to distinguish this case from *Olden*. The Tony's Lounge incident was only minimally helpful to Gagne's defense, as shown above. The same is true for the consensual oral sex at the beginning of the charged incident, since that sex too was not "brutal" or facially coercive. *Olden*'s impeachment evidence looks stronger by comparison: it included the numerous changes in the complainant's own account of the incident, plus the testimony of three witnesses—one of whom was unconnected with the parties to the case, and all of whom corroborated *Olden*'s account and contradicted that of the complainant. In credibility contests in which the issue was consent, *Olden* held a markedly better hand than Gagne did. And otherwise I think it nearly indisputable that the evidence excluded in Gagne's case was just as important to his defense, if not more so, than the evidence excluded in *Olden*'s case was.

For all of these reasons, I do not think that "fair minded jurists" (which I use only as a term of art here) could reconcile the Michigan Court of Appeals's reasoning with that of the Supreme Court in *Olden*. In this case, as in *Olden*, it is plain that "'a reasonable jury might have received a significantly different impression of the [complainant's] credibility had defense counsel been permitted to pursue his proposed

line of cross-examination.'"  *Olden*, 488 U.S. at 232 (citation and internal alterations omitted).  Indeed, as noted above, the way the trials proceeded in each case was so similar that the Michigan court's decision was arguably "contrary to" the Supreme Court's decision in *Olden.*[2]  *See* 28 U.S.C. § 2254(d).  But in any event the Michigan court's decision was an unreasonable application of *Olden*; and that is enough to require issuance of the writ.

*   *   *

In this case, as in *Chambers*, a decision to grant relief would "establish no new principles of constitutional law."  410 U.S. at 302.  It would only require us to apply long-established principles in a specific context in which the Supreme Court has already told us they apply.  In *Michigan v. Lucas*, 500 U.S. 145 (1991), the Court said that the exclusion of the specific kind of evidence at issue here—evidence of past consensual sex between a rape defendant and the complainant—"unquestionably implicates the Sixth Amendment" and "diminishe[s]" the defendant's rights "to confront adverse witnesses and present a defense[.]"  *Id.* at 149.  Whether the diminution of those rights amounts to a violation of them, of course, depends "on the facts of th[e] case[.]"  *Id.* at 153.

Gagne's rights were violated on the facts of this case.  The Michigan courts unreasonably applied the Supreme Court's precedents in holding the contrary.  I respectfully dissent.

---

[2]The plurality opinion is incorrect in its assertion that I have adopted an interpretation of "contrary to" that would find the standard met when "the state-court decision [was] simply erroneous or wrong."  *Williams v. Taylor*, 529 U.S. 362, 389 (2000) (Stevens, J., dissenting) (internal punctuation omitted).  What I have tried to do, rather, is to analyze the factual and legal parallels between *Olden* and *Chambers*, on the one hand, and this case on the other—a task that the plurality does not even attempt. It is those parallels, and not a sense that the state court of appeals's decision was "simply wrong," that underlie my conclusion that the state court's decision was arguably contrary to the relevant Supreme Court decisions (and more certainly an unreasonable application of them).  The plurality, for its part, does little more than announce that the state court's reasons were "legitimate"—which amounts to an assertion that the state court's decision was simply right.